BEATTIE *v.* BOWER.

1. INSANE PERSONS—ASYLUMS—CARE, SUPPORT AND MAINTENANCE.
   Property of person who was committed to a State hospital for
   the insane would be liable for his care, support and main-
   tenance therein where it is shown to have been of the value
   of $7,000 (2 Comp. Laws 1929, § 6888).

2. SAME—INSANITY—DESCRIPTION.
   Insanity is a broad, comprehensive and generic term, of ambigu-
   ous import, for all unsound and deranged conditions of the
   mind; includes every species of organic mental derangement,
   whatever its source or cause, whether the condition is con-
   genital, the result of arrested mental development, the act of
   Providence, the party's own imprudence, religious excitement,
   physical disease, dissipation, old age, or unknown causes or
   whether it is personal or hereditary.

3. SAME—DEFINITION—CHARACTERISTICS.
   Insanity is defined to be a disorder of the mental faculties, more
   or less permanent in character, but without loss of conscious-
   ness or will, and is marked by delusions, illusions, and hal-
   lucinations, by changes in character and habits, and by
   unreasonable and purposeless actions and language.

4. SAME—DEFINITION OF EPILEPSY.
   Epilepsy is defined to be a chronic functional disease character-
   ized by fits or attacks in which there is a loss of consciousness,
   with a succession of tonic or clonic convulsions.

5. SAME—PRESUMPTION AS TO CONDITION—EXECUTION OF DEEDS.
   Condition of person whom two doctors had certified as insane dur-
   ing month previous to that in which deeds were executed, who
   was confined in an institution for the treatment of the insane
   at the time he did execute the deeds although shortly after-
   wards released and returned home, and within two months
   thereafter was ordered confined in a State hospital for the
   insane, is presumed to have been the same at time of execution
   as it was prior and subsequent thereto.

6. DEEDS—CAPACITY TO EXECUTE—EVIDENCE.

Lack of capacity to execute a deed at a particular time may be proved by the grantor's condition before and after that time, and that prior or subsequent condition may be presumed to exist at the time the deed was made; and a condition of unsoundness distinguished by common observers is adequate to justify equitable investigation, as it is not required that it should come from medical experts that a person is insane.

7. SAME—GROSS INADEQUACY OF CONSIDERATION—WEAK MENTAL CONDITION.

Imposition or undue influence upon a grantor will be inferred where there is a gross inadequacy of consideration for his conveyance coupled with a condition of great mental weakness resulting from sickness and infirmities, as one may not be a lunatic yet have such a mental condition as not fully to understand and comprehend the legal effect of a transaction when he puts his property beyond his control.

8. SAME—AGED AND INFIRM PERSONS—CONSIDERATION.

Procurement of deeds of valuable property from aged and infirm persons without proper advice and information can only be sustained on proving that the full value was given for the property bought.

9. SAME—HUSBAND AND WIFE—FRAUD—EQUITY—FIDUCIARIES—CONSIDERATION.

In passing upon issues involved in a suit by the guardian of an insane person against the ward's wife to set aside conveyances to her, a court of equity should recognize the disparity of intellectual force between the parties; their close fiduciary relationship as husband and wife; the fact that she petitioned for an adjudication of insanity by the probate court; that he was incarcerated in an institution for insane persons when the deeds were executed, whereupon the ward was released and went home and defendant collected income from his real estate; that no consideration was paid for the deeds, and there was no agreement securing him in his support and maintenance; and that he entered the institution in fair circumstances and emerged therefrom a pauper.

10. EQUITY—PROTECTION OF DEPENDENTS.

Equity protects persons in a situation of dependence upon others from being imposed upon by those upon whom they are dependent.

11. SAME—CONTRACTS BETWEEN PARTIES TO A FIDUCIARY RELATION—PRESUMPTIONS—FRAUD.

If parties bearing fiduciary relations enter into contracts with each other and such contracts are subsequently examined by a court of equity, the court will presume confidence placed, influence exerted, the instruments fraudulent, and convert the fraudulent party into a trustee and cast upon such party the burden of showing that the arrangement was not only suitable, fair and conscientious, but one expedient under the circumstances and conducive to the interests of the other.

12. INSANE PERSONS—HUSBAND AND WIFE—FIDUCIARIES—BURDEN OF PROOF.

Wife of man whom doctors had certified as insane occupied such a close fiduciary relationship to him as to impose upon her the obligation to guard most closely his interests and to abstain from · driving a bargain with him advantageous to herself and where she procured deeds to property worth $7,000 and left him a pauper she has the burden of showing the fairness and good faith of the transaction.

13. DEEDS—INSANE PERSONS—EVIDENCE—SCRIVENER.

The fact that the scrivener, an attorney, who drafted conveyances of property from plaintiff's insane ward to the ward's wife talked with the ward but did not detect that he was not mentally competent is not at all conclusive, especially where scrivener is shown to have been acting for the wife in procuring the deeds.

14. SAME — FRAUD — UNDUE INFLUENCE — CONSIDERATION — INSANE PERSONS.

Deeds of plaintiff's ward who had suffered from epilepsy and cerebral arteriosclerosis, thickening of the arteries, headaches, dizziness, mental confusion and instability, delusions, false beliefs, ideas of persecution and other symptoms, which granted all of his property to his wife without consideration and were executed while he was confined in an institution for treatment of the insane after having been certified as insane by two doctors but before being adjudicated insane by a probate court, are set aside in suit by guardian as having been procured without consideration and as the result of fraud and undue influence where, following adjudication of insanity, ward was confined in a State hospital for treatment of the insane as a public charge.

WIEST and NORTH, JJ., dissenting.

Appeal from Wayne; Callender (Sherman D.), J. Submitted June 16, 1939. (Docket No. 46, Calendar No. 40,568.) Decided October 20, 1939.

Bill by Stanley E. Beattie, guardian of the property of Lambert P. Bower, a mentally incompetent person, against Margaret L. Bower to set aside deeds to real estate. Decree for defendant. Plaintiff appeals. Reversed.

*Stanley E. Beattie,* for plaintiff.

*Arthur E. Moore,* for defendant.

POTTER, J. Plaintiff, appointed general guardian of Lambert P. Bower, an alleged mentally incompetent person, May 12, 1938, by the probate court of Wayne county, filed the bill of complaint herein June 28, 1938, as such guardian, having been authorized so to do by the probate court of Wayne county, against Margaret L. Bower, the wife of his ward, to set aside two deeds to real estate of plaintiff's ward made and executed August 4, 1934, to defendant without consideration when plaintiff's ward was confined to an institution for insane persons, claiming such deeds were without consideration and were procured by fraud and undue influence at a time when plaintiff's ward was mentally incompetent. Defendant filed an answer denying all the material allegations contained in the bill of complaint.

July 7, 1934, defendant, as petitioner, filed an application in the probate court of Wayne county for the admission to an asylum of the alleged insane person now plaintiff's ward. She alleged in such petition that plaintiff's ward was an insane person subject to sudden fits of rage, said that people were trying to steal from him, and threatened to harm the children in the neighborhood. She further alleged in such petition that plaintiff's ward then had no estate available for his support and that the relatives of plaintiff's ward who were legally liable for his support had no estate available therefor. The petition

apparently set up the names, relationships, ages, and residences of the next of kin of plaintiff's ward, but they are not printed in the record. She asked that he be admitted to the Ypsilanti State hospital or Eloise hospital or some other suitable hospital or asylum of the State. Upon the filing of this petition, the probate court ordered Harry C. Schmidt and J. Clark Moloney, legally qualified physicians, to examine Mr. Bower as to his alleged condition. Such examination was made by such physicians and Dr. Moloney certified to the probate court under oath that on the 15th day of July, 1934, he personally examined Mr. Bower, "that said person is actually insane, and that the condition of said person is such as to require care and treatment in an institution for the care, custody and treatment of the insane." He based his report upon the following grounds:

"We learn from the patient's wife that on one occasion in his life he suffered from epileptic seizures. His present mental disturbances are very characteristic of epileptic equivalents. Periodically he becomes psychotic. During these psychotic episodes he is very maniacal and very violent. He swears at the neighbors and on one occasion is alleged to have cornered a neighbor in the garage. While he discusses his difficulty he becomes very loud spoken and emotionally disturbed. He informs us that his next door neighbor 'swings at him' with some kind of an implement when he attempts to go into his own garage. He says he can hear the 'swish' of this implement in the garage. He feels that his enemies have caused the children in the neighborhood to annoy him. There is one 'Italian who is particularly offensive' to the patient. The patient states that he follows him about the neighborhood and that on one occasion he came around the corner rapidly and bumped into the patient intentionally.

"We believe that this patient is actually psychotic and in need of institutional care. We believe that

his type of psychosis is capable of permitting him to visit violence upon some innocent person."

Dr. Schmidt certified to the probate court under oath that on July 15, 1934, he personally examined Mr. Bower and "that said person is actually insane, and that the condition of said person is such as to require care and treatment in an institution for the care, custody and treatment of the insane." He certified that he formed this opinion upon the following grounds:

"Past history of epileptic seizures. Periodically psychotic, during which he is violent and maniacal, swears violently at neighbors and children whom he thinks may be hired to disturb him. Wife states he cornered a neighbor in his garage at one time. Is loud and loquacious during interview. Says neighbors swing at him with some kind of implement when he attempts to enter his own garage. Says he can hear the swish. Thinks his enemies have caused children to annoy him. States one 'Italian' follows him about neighborhood. Nearly knocked him down on one occasion. I believe patient is psychotic and is capable of doing violence to some innocent person."

The instruments in question were executed August 4, 1934. The deeds were procured to be prepared by defendant and, immediately upon the execution of the deeds by plaintiff's ward to defendant, Dr. Moloney took a vacation August 7 or 8, 1934. On September 24, 1934, however, he wrote to Miss Colburn, in care of the probate court of Wayne county:

"Regarding Lambert Bower, I saw the above named patient yesterday. The summer on the farm has not corrected his psychotic disturbance. He was all right while on the farm but he becomes violently

offensive to the neighbors on his return to the city. I suggest that the man be committed to Ypsilanti."

October 2, 1934, Bower was ordered admitted to Ypsilanti State hospital by the probate court of Wayne county and this order was based upon the original petition made in July, 1934.

At the time the original petition was filed, according to the record, Mr. Bower had real estate worth approximately $7,000. That property was liable for his care, support and maintenance in the asylum.* The deeds of the property were procured without consideration but were made by him to his wife August 4, 1934, and when Mr. Bower was admitted to the asylum he had no property of any kind. Obviously, the effect of the deeds may be to hinder, delay and defraud the State in the collection of its charges for the care, support and maintenance of Mr. Bower in the asylum.

The testimony of Dr. Yoder, of the Ypsilanti State hospital, was substantially that, based upon his examination of Mr. Bower and the petition filed by Mrs. Bower on July 7, 1934, it was his opinion Bower was insane in August, 1934. Dr. Yoder testified Bower was suffering from insanity due to cerebral arteriosclerosis, a mental condition due to the hardening of the arteries of the brain; that he was suffering from a paranoid condition characterized by ideas of persecution, irritability and emotional instability; that due to the hardening of the arteries, the blood supply to the centers of thinking, reasoning and judgment was diminished and cut down and, therefore, insanity resulted. He testified that in his opinion Bower, at the time the deeds were executed, did not have sufficient mentality to execute such instruments intelligently; that the mental age of the patient

* See 2 Comp. Laws 1929, § 6888 (Stat. Ann. § 14.811).—REPORTER.

was childish and that he was limited in his scope of thinking and reasoning; that Bower's paranoidal condition was due exclusively to arteriosclerosis because the patient had a psychosis due to cerebral arteriosclerosis; that in this particular case his paranoidal condition characterized by ideas of persecution was specifically the result of that arteriosclerosis; that in August, 1934, Bower was suffering from certain false beliefs which ''had gotten to the point where they amounted to insanity;'' that that was his condition at that time; that from his personal examination of Bower, he found distinct evidences of the thickening of the arteries, his face was not symmetrical, one side was lower than the other, he complained of dizziness, headaches, periods of confusion when he could not think, periods of mental instability. His testimony was based on his own physical findings, his observation of the patient's reactions, and his knowledge of the history of the case and his experience as a psychiatrist. The only testimony opposed to this was that of Dr. Moloney who testified that after the petition was filed and he certified the patient was insane, he undertook to treat him at the Haven, a Rochester sanitarium, and that he, almost miraculously, became immediately sane and rational and remained so until the deeds were procured, without consideration, stripping the ward of all his property so that he is now dumped into the lap of the State as a pauper patient.

Insanity is a broad, comprehensive and generic term, of ambiguous import, for all unsound and deranged conditions of the mind. It includes every species of organic mental derangement, whatever may be its source or cause, whether the mental condition is congenital, or the result of arrested mental development, or of the act of Providence, or of the party's own imprudence, or of religious excitement,

or of physical disease, or of dissipation, or of old age, or of unknown causes, or whether it is personal or hereditary. 32 C. J. p. 594.

Insanity is defined to be a disorder of the mental faculties, more or less permanent in character, but without loss of consciousness and will. It is marked by delusions, illusions and hallucinations, by changes in character and habits, and by unreasonable and purposeless actions and language. Dorland's American Illustrated Medical Dictionary (17th Ed.), p. 674.

Epilepsy is defined to be a chronic functional disease characterized by fits or attacks in which there is a loss of consciousness, with a succession of tonic or clonic convulsions. Dorland's American Illustrated Medical Dictionary (17th Ed.), p. 467.

The prior and subsequent condition of Bower is presumed to have existed at the time the deeds were made. *Haines* v. *Hayden,* 95 Mich. 332 (35 Am. St. Rep. 566); *Spencer* v. *Terry's Estate,* 133 Mich. 39.

Lack of capacity to execute a deed at a particular time may be proved by the grantor's condition before and after that time, and that prior or subsequent condition may be presumed to exist at the time the deed was made. A condition of unsoundness distinguished by common observers is adequate to justify equitable investigation. It is not required that it should come from medical experts that a person is insane or from nonexperts that he is crazy. *Jacox* v. *Jacox,* 40 Mich. 473 (29 Am. Rep. 547).

Though one may not be a lunatic, his mental condition may be such that he does not fully understand and comprehend the legal effect of a transaction when he puts his property beyond his control. *Polt* v. *Polt,* 205 Pa. 139 (54 Atl. 577).

It is sufficient to show that from his sickness and infirmities he was at the time in a condition of great

mental weakness, and *there was gross inadequacy of consideration for the conveyance.* From these circumstances, *imposition or undue influence will be inferred.* *Allore* v. *Jewell,* 94 U. S. 506.

"Whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and *the consideration given for the property is grossly inadequate,* a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside." *Allore* v. *Jewell, supra,* 511.

Where deeds of valuable property are procured from an aged and infirm person without proper advice and information, such a purchase *can only be sustained on proving that the full value was given for the property bought.* *Baker* v. *Monk,* 33 Beav. 419 (55 Eng. Rep. 430).

This court should recognize the disparity of intellectual force between the parties; their close fiduciary relationship as husband and wife; the fact she had procured an adjudication of insanity by the probate court; that he was incarcerated in an institution for insane persons when the deeds were procured, and that when they were procured plaintiff's ward was released and went home and defendant began the collection of the income from his real estate; that no consideration was paid for the deeds, and there was no agreement securing him in his support and maintenance; and that he entered such institution in fair circumstances and emerged therefrom a pauper. *Ridky* v. *Ridky,* 226 Mich. 459.

There is no principle of equity which the court is more ready to exercise than that which protects persons in a situation of dependence upon others from being imposed upon by those upon whom they are

dependent. *Smith* v. *Kay,* 7 H. L. Cas. 750 (11 Eng. Rep. 299).

"In equity there are certain rules prohibiting parties bearing certain relations to each other from contracting between themselves; and if parties bearing such relations enter into contracts with each other, courts of equity presume them to be fraudulent, and convert the fraudulent party into a trustee." 1 Perry on Trusts & Trustees (6th Ed.), p. 312, § 194.

"Where an antecedent fiduciary relation exists, a court of equity will *presume* confidence placed and influence exerted." 2 Pomeroy's Equity Jurisprudence (4th Ed.), p. 2026, § 951.

"He has been rendered practically a pauper. * * * That such a result has been the deliberate and understood purpose of a person of sound mind and free from fraud or undue influence, is preposterous. *Such a state of things indicates beyond question either incapacity or dishonest management or both.*" *Thorn* v. *Thorn,* 51 Mich. 167.

"Transactions of this nature are regarded by courts of equity with suspicion, and scrutinized with vigilance. The presumption is against the propriety of the transaction, and, as has been frequently said in our own cases, the duty of courts is to refuse judicial sanction to such an instrument until fully satisfied of the fairness of the transaction, and that the instrument is the intelligent act of the person executing it. *Seeley* v. *Price,* 14 Mich. 541; *Witbeck* v. *Witbeck,* 25 Mich. 439; *Wartemberg* v. *Spiegel,* 31 Mich. 400; *Barnes* v. *Brown,* 32 Mich. 146; *Duncombe* v. *Richards,* 46 Mich. 166; *Jacox* v. *Jacox,* 40 Mich. 473 (29 Am. Rep. 547); *Finegan* v. *Theisen,* 92 Mich. 173." *Smith* v. *Cuddy,* 96 Mich. 562.

"In case it appears from the facts that there was mental disorder, but not of a high degree or far ad-

vanced, it then becomes material to inquire into the nature of the transaction and the influences leading to it. And if the circumstances disclose that the person under the infirmity, whether through choice, accident or otherwise, was as matter of fact for the time being in the place of ward of the other party, or was by his own consent, however brought about, in a state of submission to the judgment or opinion of the other, a presumption will arise adverse to the justice and equity of the bargain, and the bargainee will be required to show that no advantage was taken and that in itself the arrangement was not only suitable, fair and conscientious, but *one expedient under the circumstances and conducive to the interests of the other.*" *Jacox* v. *Jacox, supra,* 476.

"In all the variety of the relations of life in which confidence is reposed and accepted, and dominion may be exercised by one person over another, the court will interfere and relieve against contracts or conveyances when they would abstain from granting relief if no particular relation existed between the parties in which trust and confidence was reposed and accepted and there was not *an opportunity for an abuse of the confidence and the exercise of undue influence.*" *Waddell* v. *Lanier,* 62 Ala. 347, 349.

"When a party deals with a man whom he knows to be of weak intellect, and the good faith of such dealings is challenged, *the burden of proof is with the party who has dealt with the weak-minded person to show that no undue advantage was taken.* The law throws its protecting shield around mentally incompetent persons, from whatever cause, and while, in some cases, it is permitted them to make contracts so long as they are not under the restraint of guardianship, these are binding *only so far as they rest upon adequate considerations, and are free from fraud or overreaching.*" *Gates* v. *Cornett,* 72 Mich. 420, 434.

The condition of Mr. Bower and the close fiduciary relationship between the parties to the deeds were

such as to impose upon defendant the obligation to guard most closely his interests and to abstain from driving a bargain with him advantageous to herself. *Noban* v. *Shoup,* 171 Mich. 191.

In *Connor* v. *Harris,* 258 Mich. 670, it was said:

"The grantor was peculiarly under the care, control, and domination of defendant, who stood in a fiduciary relation to her, and obtained, without consideration, a large amount of property from grantor. Under such circumstances the burden of proof is upon defendant, to show the fairness and good faith of the transaction. *Seeley* v. *Price,* 14 Mich. 541; *Witbeck* v. *Witbeck,* 25 Mich. 439; *Barnes* v. *Brown,* 32 Mich. 146; *Jacox* v. *Jacox,* 40 Mich. 473 (29 Am. Rep. 547); *Gates* v. *Cornett,* 72 Mich. 420; *Sponable* v. *Hanson,* 87 Mich. 204; *Hemphill* v. *Holford,* 88 Mich. 293; *Smith* v. *Cuddy,* 96 Mich. 562; *Whiteley* v. *Whiteley,* 120 Mich. 30; *Noban* v. *Shoup,* 171 Mich. 191; *In re Sadler's Estate,* 201 Mich. 281; *Wagbo* v. *Smiseth,* 227 Mich. 313; *Bilman* v. *Kolarik,* 234 Mich. 689; *Cole* v. *Henning,* 237 Mich. 108; *Coy* v. *Doney,* 241 Mich. 308.''

In *Mettetal* v. *Hall,* 288 Mich. 200, the principle of the above cases was reviewed and reaffirmed.

Judge Hartrick, then engaged in practicing law, drew the deeds in question at his office at Mrs. Bower's request. He testified that a few remarks passed between Bower and himself at the time the deeds were executed; that he could not give the exact language; that he saw nothing that would indicate there was any unusual condition from which he could say that Bower was not mentally competent; that he could not say one way or the other anything about his mental condition except he appeared like anyone who might be nervous or had had a nervous breakdown.

The fact that the scrivener detected nothing wrong is not at all conclusive, especially in this case where he is shown to have been acting for the defendant.

*Kastell* v. *Hillman,* 53 N. J. Eq. 49 (30 Atl. 535);
*White* v. *White,* 89 Ill. 460; *Duncombe* v. *Richards,*
46 Mich. 166, 171. In the latter case, it was said:

"To show such a will the magistrate who drew
and took the acknowledgment of the papers was
sworn. His evidence shows clearly that defendant
was the principal actor in procuring the assignments
to be made, but it also shows that the magistrate
believed the intestate knew at the time what he was
doing. But if the magistrate suspected no wrong—
and apparently this was the fact—he might easily
have supposed he saw evidences of intelligence which
were only apparent, not real."

"No faithful agent would without advising against
it, when it was within the line of his duty, have per-
mitted a principal, aged, infirm in body and intellect,
to have parted with his entire estate, absolutely and
unconditionally, reserving no means of, and no secu-
rity for a support, without at least advising against
it." *Waddell* v. *Lanier, supra,* 354.

Mr. Bower had suffered from epilepsy, in itself a
disease affecting the brain. In addition, he suffered
from arteriosclerosis, a contracting and hardening
of the arteries of the brain, which affected the blood
supply thereto. There was a thickening of the
arteries, headaches, dizziness, mental confusion and
instability. He suffered from delusions, false be-
liefs, ideas of persecution, and other symptoms from
which all the physicians sworn concluded he was in-
sane. Defendant stood in a close fiduciary relation-
ship to him and was not so scrupulously honest as to
reveal to the public authorities that Mr. Bower had
considerable valuable real estate which might be
available for his institutional support. She insti-
tuted the proceedings to have him declared insane.
The doctors state he was insane. He was then taken
to a private institution for insane persons. She pro-

cured the deeds to be drafted and presented to him while he was confined in an institution, and he signed and acknowledged them. These deeds were wholly without consideration and without any agreement upon the part of the grantee therein to support and maintain him. When these deeds were procured, Bower was released and went back to the city and his doctor took a vacation. Shortly thereafter the doctor concluded Bower was in the same condition he was prior to the time he entered this institution. The court pronounced him insane and he was then committed to the Ypsilanti State hospital as a public charge as an insane person.

Even Dr. Moloney says he advised against sending him to the Haven because he was a hopeless problem from a treatment point of view. And yet, we are asked to believe that this man, who had been insane for several years and who is still insane, suffering from an incurable form of insanity which gradually grows worse, at a particular time when subject to the influence of his wife, voluntarily stripped himself of all of his property and rendered himself practically a pauper. As said in *Thorn* v. *Thorn*, 51 Mich. 167:

"That such a result has been the deliberate and understood purpose of a person of sound mind and free from fraud or undue influence, is preposterous. Such a state of things indicates beyond question either incapacity or dishonest management or both."

I think the deeds should be set aside.

BUTZEL, C. J., and BUSHNELL, SHARPE, CHANDLER, and McALLISTER, JJ., concurred with POTTER, J.

NORTH, J. (*dissenting*). Plaintiff, as guardian of the property of Lambert P. Bower, an insane person, by this bill of complaint, filed June 28, 1938,

seeks cancellation of two quitclaim deeds by which Bower purported to convey to the defendant, his wife, all his property, being four separate parcels of land. Each of these two deeds purported to convey two parcels; one covering properties in Wayne county and the other properties in Oakland county. The deeds were executed and delivered August 4, 1934. Plaintiff was appointed guardian May 12, 1938. Cancellation of these deeds is sought on the ground that they were given without consideration and at the time of their execution and delivery Lambert P. Bower was mentally incompetent. After full hearing the circuit judge entered a decree dismissing the bill of complaint. Plaintiff has appealed.

The properties in general terms may be described and the character indicated as follows:

Parcel #1. The homestead property of these parties located at 1093 West Lantz avenue, in the city of Detroit, Wayne county. The assessed value of this parcel is $2,100, though its actual value is in excess of this figure. It is mortgaged for approximately $1,500. Defendant has tenants occupying the place with her and when rented the monthly income is $45 to $50.

Parcel #2. This is located in Hamtramck township, Wayne county. It was sold on a contract in 1936, and by his deed Bower conveyed to defendant the interest of a vendor in a land contract of a value of $1,800 or thereabouts.

Parcel #3. This consists of parts of two lots, unimproved, in Royal Oak township, Oakland county. The testimony is convincing that the taxes in arrears on this property equal its full value.

Parcel #4. This consists of a house and lot in Southfield township, Oakland county. Before plaintiff instituted suit defendant had conveyed this property for value to innocent purchasers. The property

was badly incumbered and it appears the net proceeds derived from its sale were used in paying an obligation of defendant and her husband and in repairing the other properties or reducing liens thereon. For these reasons appellant is not asking any relief incident to parcel #4.

Lambert P. Bower and defendant were married in 1925. At that time she was 52 and he 53 years of age. There are no children of the marriage. They lived together until 1934 and by that time the husband developed rather marked traits of insanity. On July 7, 1934, defendant filed a petition in the probate court of Wayne county seeking the commitment of her husband as an insane person. In her petition it was set forth that Bower was subject to sudden fits of rage, that he believed people were trying to steal from him and that he threatened to do harm to neighborhood children. Upon filing the petition the probate court appointed Dr. J. Clark Moloney and Dr. Harry E. Schmidt to examine the alleged insane person. These doctors made examinations and each filed with the probate court a certificate containing recital of detailed facts and circumstances and concluding in each instance in substance as follows:

"We believe that this patient is actually psychotic and in need of institutional care. We believe that his type of psychosis is capable of permitting him to visit violence upon some innocent person."

The matter was brought on for hearing in the probate court July 18, 1934. Commitment was not then ordered, but instead the proceedings seem to have remained in abeyance.

About July 17 or 18, 1934, at the instance of Mrs. Bower, her husband was taken to a private institution in this State where treatment is provided for

mental and nervous cases. This was done under the supervision of Dr. Moloney, who testified:

"I placed him on a rest regime; reassurances, same sedative medication, and much to my surprise, in about a week or 10 days time the patient's symptoms disappeared completely. His delusional psychosis disappeared; he was able to talk rationally about his delusions and stated it was merely a figment of his own mental sickness at the time that they had occurred. His mental instability had disappeared. His reactions of wanting to do violence had disappeared. That was somewhere within about the latter part of July; I would say about a week or 10 days after we had him in the hospital. When I speak of reassurances, I mean therapy. That is known as psychotherapy; psychiatric treatment relieving the man of his feelings of insecurity, * * * attempting to get him to take a more rational attitude towards these various delusions that he had. * * * I saw him at least once a week and at other times twice a week. * * *

"I advised the patient, as a continuance of treatment, I directed in this case that he be freed of all responsibility, financial, domestic and otherwise, and also advised that the property, over which there was some case at that time, that he be not diverted with it, and that the property be turned over to the wife as a matter of treatment, and also advised the patient not to go home immediately, but that he go out to some farm for a period of 5 or 6 weeks and continue his treatment, not knowing, probably if he would come back in the old environment his psychosis or mental disease might return again."

While Mr. Bower was still an inmate of this institution, defendant caused the deeds in suit to be prepared by an attorney who was present at the time the deeds were executed by Mr. Bower. This attorney had "a slight acquaintance" with Mr. Bower.

He had served him on two or three occasions as a lawyer. When testifying in this case he said:

"He· (Bower) was handed the paper, he looked at it, indicated to be reading it, of course, attention was challenged at the proper place to affix his signature. That he did. His attention was further challenged to the nature of the instrument he was signing and its effect. His conversation in answer thereto in substance indicated that he knew he was signing a deed. * * * I saw nothing to mark that would indicate that there was any unusual condition that I could say he was not competent. * * * I observed nothing—as far as I can state, I observed nothing.

"*Q.* Nothing that would indicate insanity, is that what you mean?

"*A.* Well, I can't qualify as a person judging insanity, but I saw nothing that would make me suspicious. I would have interfered if there would have been anything unusual or that would have challenged the attention or demand interference."

All the testimony of this witness was objected to by plaintiff on the ground that he was the agent of defendant who was the opposite party in interest to plaintiff's insane ward. See 3 Comp. Laws 1929, § 14219 (Stat. Ann. § 27.914). In his opinion the circuit judge stated that because of this objection he had disregarded the testimony of this witness in reaching his decision.

Within a few days after Mr. Bower signed these deeds (August 4, 1934), he was discharged from the institution where he was then staying. But on October 2, 1934, the probate court issued a commitment under which Mr. Bower was placed in the Ypsilanti State hospital for insane, and he was still there under the commitment when this case was tried in October, 1938.

The decisive issue is whether Mr. Bower was competent to make a valid conveyance the day he

signed the deeds. Plaintiff contends he was not, but defendant asserts that he was then competent. As sustaining her contention of competency the defendant on this hearing produced the testimony of Dr. Moloney hereinbefore quoted and the testimony of the attorney who drafted the deeds. As noted, the testimony of the latter was rejected by the trial court. In addition to his testimony hereinbefore quoted, Dr. Moloney testified in detail as to Mr. Bower's mental condition throughout the period here in controversy. He testified that just prior to the execution of the deeds he had gone over "this matter with Mr. Bower," that Mr. Bower's mental confusion had disappeared at that time, his delusionary system was not in evidence, and he was emotionally stable, and that in the doctor's opinion Mr. Bower was mentally competent to execute the deeds at the time he did so; the witness saying: "I had discussed it with him myself and gone into how much property he owned." It would be of no service to further detail the rather lengthy testimony of Dr. Moloney which definitely came to this:

"Based on my experience with this man and my treatment of him prior to August 4th, my opinion as to his mental condition on August 4, 1934, is that he was mentally competent to negotiate that instrument."

Dr. Harry E. Schmidt, who examined Mr. Bower incident to the probate petition, as hereinbefore mentioned, was also called as a witness by defendant. He testified he had seen Mr. Bower once prior to his examination of him July 16th, fixing the date as a week or possibly two weeks prior to July 16, 1934, that at that time the patient was very disturbed and "showed some evidence of arteriosclerosis, material elevation of blood pressure," and was depressed. But notwithstanding his contacts with Mr. Bower

in July, the doctor, not having had any care of the patient after July 16th, testified he was not able to pass on Mr. Bower's condition as of August 4th from. personal examination.

Defendant was a witness in her own behalf, but on plaintiff's objection her testimony directly bearing upon the controlling issue was excluded under the statute. See 3 Comp. Laws 1929, § 14219 (Stat. Ann. § 27.914).

Plaintiff, in support of his contention of incompetency, produced in evidence the records of the probate court proceedings hereinbefore detailed and also the testimony of Dr. Orus R. Yoder, who was then the assistant superintendent of the Ypsilanti State hospital. Dr. Yoder first examined Mr. Bower sometime after he was committed to the Ypsilanti State hospital, October 8, 1934. The doctor was rather indefinite as to how long after the commitment this examination occurred. He first said two or three weeks, and later said possibly a month or more after the commitment. The doctor testified quite in detail concerning his observations of Mr. Bower and his mental condition while in the Ypsilanti State hospital, and stated that the patient was suffering from insanity due to cerebral arteriosclerosis, that his condition was characterized by ideas of persecution and irritability and emotional instability, and that Mr. Bower's condition in the summer of 1934 had affected the organic structure of his brain. The doctor was of the opinion that Mr. Bower's condition was a matter of some years' development. When asked his opinion as to Mr. Bower's possessing sufficient mentality in August, 1934, to understand transactions of the character here in suit, the doctor replied: "I don't think that he had sufficient mentality at that time." On cross examination he testified:

"Mr. Bower can converse intelligently at the present time (four years after his commitment). He recognizes his friends and exhibits normal affection toward them. * * * I can't give you any specific date when his insanity began. It started three or four years before his admission to the Ypsilanti State hospital, in my judgment. It was slow in its onset."

The circuit judge who saw the respective witnesses and heard their testimony filed an opinion in which he reviewed the record quite in detail. He noted the fact that of all the witnesses Dr. Moloney had the best opportunity to make observations and to form a reliable opinion as to Mr. Bower's mental condition on the date these deeds were executed. And in reviewing the testimony of plaintiff's witness, Dr. Yoder, the judge in the opinion filed by him made the following pertinent observation:

"On cross examination, Dr. Yoder admitted that Mr. Bower, on the 4th of August, 1934, approximately three months previous to Dr. Yoder's first observance, might have been sane."

But the doctor added: "It is not probable." The trial judge concluded that the record failed to establish Mr. Bower's mental incompetency on the day the deeds were executed by him and that therefore the conveyances were valid. Accordingly he entered a decree dismissing plaintiff's bill of complaint.

Plaintiff also charges that the deeds in suit were procured by defendant through fraud, deceit and undue influence. As the circuit judge held, the record does not entitle plaintiff to relief on any of such grounds.

It is pointed out by appellant the trial judge reached his conclusion upon the theory that the burden of establishing Mr. Bower's incompetency was on plaintiff. It is claimed this was error, appellant

asserting that under the facts in this case the defendant wife sustained a fiduciary relation to the husband, and the burden rested on her, not on plaintiff. Regardless of the correctness of this contention, the record before us does not warrant reversal. We hear the case *de novo* on appeal in chancery. Our review satisfies us that the circuit judge reached the right result. The decree entered in the circuit court should be affirmed, with costs to appellee.

WIEST, J., concurred with NORTH, J.