**YANCY et, Plaintiffs, v. ERMAN etc., Defendant.**

Common Pleas Court, Cuyahoga County.

No. 568173.

302

Woodle & Wachtel, Edwin F. Woodle, Cleveland, for plaintiffs.

Richard O. Horn, Cleveland, for defendant's guardian.

## OPINION

By HOOVER, J:

This presents two matters of first impression. One, probably a first in the United States, is whether, in an action in which an incompetent is a party, the duly appointed guardian of his person and estate can waive a privileged communication between the incompetent and his former lawyer. The second, a first in Ohio, is whether the unsound mental condition of a defendant is ground under Par. 7 of §11631 GC, for vacating a default judgment taken against him if such judgment, though rendered when he was not under any court—declared incompetency, was nevertheless taken at a "trial" at which he was not represented by any one—i. e.—neither by himself, nor by guardian ad litem, nor by counsel.

In its much amended form, this is an action by realty buyers

against a seller to recover damages for failure to convey, arising out of an alleged written sale contract dated April 2, 1946. The action was filed August 23, 1946.

On March 3, 1948, the Probate Court appointed one, Jay Namen, as guardian of the estate of the defendant, an incompetent. On August 16, 1948, such guardian filed an answer and cross-petition in the instant action. On January 5, 1949, the Probate Court terminated such guardianship. However, before the default judgment was taken, no further pleading was filed for the defendant in the instant action, and therefore, at that time, the latest pleading on behalf of defendant was the one filed by a person who had ceased to be guardian.

A number of pleadings had been filed by the defendant before such guardian entered this case. They, as well as the pleading filed by the guardian, carried the name of Apple and Apple, as attorneys.

In the file are two letters signed by defendant addressed to the Clerk of Courts, dated January 5 and January 19, 1949, respectively, and typewritten on the letterhead of Greenfield, Malitz and Greenfield, instructing that A. E. Greenfield and David Weaver be substituted in place of Apple and Apple as defendant's attorneys.

On October 10, 1949, plaintiffs' motion to place this case on the active trial list for November 7, 1949, was granted. On November 3, 1949, the Clerk received a letter on the stationery of A. E. Greenfield, dated November 3, 1949, stating that "we no longer represent Herman Erman in any matter" and specifically the instant case. On November 15, 1949, the Court's Assignment Commissioner wrote to defendant saying that since he had no attorney representing him, please be advised that this case would be assigned to a court room for trial on November 22, 1949 and that it would be necessary for him to be present prepared for trial without further notice. When the case came on for trial, defendant was not present and no guardian ad litem or attorney represented him. Default judgment was taken for plaintiffs for $1500.00, and judgment was rendered against defendant on his cross petition.

On August 19, 1950, the Probate Court appointed Richard Horn guardian of defendant's person and estate, on ground of mental incapacity. That day, the guardian filed a petition herein to vacate the judgment after term. The petition stated that from January 5, 1949 to August 19, 1950 (the period between the two guardianships and within which the default judgment was taken) the defendant was without the representation of a guardian, and was in fact incompetent to handle

his own affairs; that he was not represented and did not appear at the trial; and that the judgment should be vacated for the following reasons (we set forth, because we deem it necessary to consider, only reasons 5 and 6):

5. Erroneous proceedings were had against a person of unsound mind where the condition of such person would not appear in the record.

6. Due to unavoidable casualty or misfortune, a party in interest was prevented from defending the subject action.

The petition to vacate avers that defendant has a valid defense. Three defenses are then set forth—the same three that are set forth in earlier pleadings for defendant—which essentially are (1) a general denial, (2) fraud of plaintiffs' agent and (3) plaintiffs' breach of conditions. Included is a cross petition for cancellation.

Later, the guardian filed an Amended Answer and Cross Petition. This answer admits the signing of the paper dated April 2, 1946, but alleges that defendant's signature was procured by willful and fraudulent representations at a time when, due to advanced age, mental incapacity and incompetence, defendant was not capable of that degree of understanding necessary for him to comprehend the obligation which he signed, which incompetence, lack of understanding and mental infirmities were well known to plaintiffs. Again, a cross petition asks cancellation.

At the hearing on the petition to vacate, defendant produced as a witness one Inez Verby who has lived directly across the street from defendant for more than 10 years. He came to her home often and she knew him well. Once he lived at her home 10 days. She is a registered nurse, having graduated from Lakeside Hospital in 1915 and having been in the practice since then. She has handled many mental cases. She testified that from April 1, 1946 to the present time, the defendant was irrational, was of unsound mind and had no mental capacity to understand important business or to perform ordinary business transactions.

Miss Verby based her opinion on the following facts to which she testified. Defendant is nearly 83 years old. He came to her often with his troubles for advice. He was non-cooperative at all times. When she explained something he would burst out in temper and go into extreme waves of swearing and screaming at her. When his wife died about 1942 he became much worse and was at witness' house more frequently. He was lonesome, disturbed, disoriented. About 3 days after his wife died he advertised in the newspaper for a housekeeper or a wife. He was pitiful, and all mixed up. He did idiotic things. He believed that people were persecuting

him and that no one was his friend. He heard noises in his house. He came to her house one night at 2:00 A. M. saying that people were after him and knocking on his windows; and he stayed at her house the balance of the night. To protect himself, he closed and boarded some of his windows, including the big bay window. He took out the glass, covered the window over with siding and painted it with lime. He covered the whole house with lime. He boarded up his porch with laths and cardboard cartons so no one could look in. He would remain on the porch all night in the summer with the lights on, sleeping on two chairs with no pillow. He put about a dozen spikes in a two-by-four and laid it in his driveway so people wouldn't enter. People whose tires were punctured had him before the prosecutor. He put in a large stump on the corner of his tree lawn to prevent people from getting near his premises. Though the law allows car parking in front of his house, he objected. Near the curb he erected gas pipes about an inch in diameter and 2 feet long which he bent over so as to rip fenders of anyone parking there. Further to prevent such parking, he strewed broken glass on the street, smeared parked cars at night with mud and broke locks on cars parked there. He doesn't like other people. The neighbors do not like him. They fear him. They shut the door on him. When he passes them on the opposite side of the street, he swears at them and uses foul language. He follows people. Once he met the witness on 105th Street and followed her all the way home. Last fall her gardner had to prevent him from attacking her when he found a sign erected on his premises advertising the Probate Court land sale. Though she has befriended him, he accuses her of his difficulty. He is estranged from his children. Though his house is tied up in Probate Court and he does not own the full interest in it and though he is under guardianship, he continues to try to sell it, and barks at people who come to look at it. The witness said she tried to reason with him, but it is impossible and she has given up.

Another witness produced by defendant was Attorney Alexander Apple, of the firm Apple and Apple. He testified that from the beginning of 1946 until he ceased being defendant's attorney in January, 1949, defendant's mind was very unsound at times; that he didn't have enough mind to conserve and manage his property; that he didn't have the mental capacity to transact ordinary business beyond probably buying groceries at a store; and that in an instance like this where pleadings were filed and the case placed on the active list a short time before his attorney withdrew, defendant wasn't competent to select counsel.

Attorney Apple based his opinion on the following facts to which he testified. His firm had been doing work for defendant continuously for almost 10 years until about 1949 when it was supplanted by Attorney Greenfield. Defendant was a difficult, non-cooperative client. He wouldn't follow advice. He couldn't make up his mind. He was changeable like the weather. In his 30 years of practice, Apple never had a client whose failure to cooperate was so glaring and who changed his mind so much. By such failure he put his limited property in jeopardy. He disregarded Apple's advice when he signed the paper on which the instant action is based, thereby purporting to sell a property to which he did not have full title and which was tied up in Probate Court. As a result he became involved not only in the instant suit, but in an action by a broker to collect a commission. He seemed to be in a fog—sort of groping. He wouldn't understand what was going on. He didn't realize he had to do things legally and cooperate. He could hardly read English, if at all. Defendant couldn't understand a deal in reference to any property of substantial value. Apple had the most difficult time in getting defendant to come in and do anything about the instant case when it came on for trial at a previous time before Judge Connell—and with default then confronting him. At the court room, defendant became noisy and excitable. Apple went with him into the lobby and tried to persuade him to come in and sit down and try the case and be a witness. Apple couldn't make him understand why he had to do that. He said it was his property and no one was going to take it away from him. Defendant started pounding his fists on his forehead and talked about jumping out of the window. Apple could not handle him. Apple told the Judge he couldn't try the case. The trial had to be postponed. Apple thereafter couldn't get defendant into his office. He wouldn't respond to Apple's letters or calls. The case came up a number of times and Apple had to get a number of continuances. Finally Namen was appointed guardian, and later Apple was supplanted by Attorney Greenfield.

Plaintiffs had only one witness—the plaintiff Mary Yancy. She said she talked with defendant several times at his house, both before and after signing. He showed her the house and discussed sale of furniture. She said he was a foreigner, but she didn't have any difficulty understanding him and he understood her. She also said he was not excited or confused while she was there.

After observing the witnesses and listening to the testimony the court has no hesitancy in finding that the defendant's mind was unsound when the default judgment was taken, and

a considerable time before and subsequent thereto. 44 C. J. S. 46-48, Sec. 2 (Definitions of Unsound Mind and Unsoundness of Mind); Black's Law Dictionary (1944) 1786 (Definition, Unsound Mind); Ballentine's Law Dictionary (1930) 1320 (Definition, Unsound Mind); **Lowe v. Union Trust Co., 124 Oh St 302, 307** (client unable to converse intelligently about case, or to understand what the situation was, or what was happening to her); **Wheeler v. State, 34 Oh St 394, 399** (threat of suicide); **Niemes v. Niemes, 97 Oh St 145, 153, 154** (layman permitted to give opinion as to whether mind was sound or unsound, whether had ability to transact ordinary business, and whether could understand ordinary or important business transactions); **Weis v. Weis, 147 Oh St 416, 420** (same; also permitted to testify whether rational or irrational); Herlihy v. Kane, 310 Mass. 457, 458 (non-cooperative, disoriented, wouldn't listen to reason); Bensberg v. Washington University, 251 Mo. 641, 651, 662 (delusions of being persecuted, being pursued, having no friends); Petroleum Casualty Co. v. Kincaid, 98 S. W. (2) T. C. A. 499, 501 (delusions—false beliefs); Wuller's Estate, 14 Pa. Dist. 88 (symptoms—delusions, extreme irritability, proneness to anger, suspicion, obstinancy, abnormal impulses and inclinations); Pulaski County v. Hill, 97 Ark. 450, 457, syl. 4 (unable to conduct ordinary affairs of life, susceptibility to be victim, unable to govern self or affairs rationally); Snyder v. Snyder, 142 Ill. 60, 68-70 (inability to transact ordinary business and to take care of and manage his property); Commonwealth v. Schneider, 59 Pa. St. 328, 330 (inability to manage his property or affairs); Fiscus v. Turner, 125 Ind. 46, 48-49, syl. 47 (essential privation of reasoning facilities, or incapable of understanding or acting with discretion in ordinary affairs of life); Beattie v. Bower, 290 Mich. 517, 521, 522, 523, 525 (persecution complex, being followed, irritability, emotional instability, swearing violently at neighbors, delusions, unreasonable and purposeless actions and language); Parsons v. Parsons, 66 Io. 754, 757, syl. 4 (acting strangely); Bell v. Blackwell, 273 S. W. (T. C. A.) 870, syl. 4, reversed on other ground in 283 S. W. 765 (unsoundness shown by appearances, acts and conduct which to person of ordinary intelligence would indicate abnormality); 44 C. J. S. 51, Sec. 51 (surrounding circumstances, conduct and appearance, irrational acts and beliefs, improvident bargains); **22 O. Jur. 102, Sec. 57 (same)**; 28 Am. Jur. 759, Sec. 132 (same); Ekin v. McCracken, 11 Phila. (Pa) 534, 536 (the greater the number of absurd and irrational acts, the stronger the evidence); **22 O. Jur. 106, Sec. 60** (evidence of condition a reasonable time before and after the event); 44 C. J. S. 52, Sec. 5 (same); 28 Amer. Jur. 759, Sec. 132 (same);

17 O. Jur. 478-79, Sec. 385 (laymen's opinion); 22 O. Jur. 99, Sec. 56, 106-07, Sec. 61 (opinion of neighbors and laymen).

A mere eccentric mind is not an unsound one, 44 C. J. S. 14, Sec. 2, but this descends to a level far below eccentricity. Here is such a startling conglomeration of such startling abnormalities of such startling degree that it stamps "unsound" the mind from which it springs. To single out any one abnormality and say that it alone is not sufficient to establish unsoundness, cannot discount the combined effect. A book is no less a book because you can say of each separate page "That is not a book."

The Court gives more weight to the testimony of defendant's witnesses. In contrast to the plaintiffs' one witness who in fact was one of plaintiffs, the defendant's witnesses knew and had an opportunity many times to observe the defendant over a period of years. Emery v. Hoyt, 46 Ill. 258, 259, syl. 1; Ergang v. Anderson, 378 Ill. 312, 313-314. Besides, the defendant's witnesses were disinterested. Because of defendant's conduct toward them, no one could expect them to be partial toward defendant.

How does defendant's unsound mind affect our problem? The pertinent parts of §11631 GC, read:

"The common pleas court * * * may vacate * * * its own final order, judgment or decree after the term at which it was made:

"* * *

"5. For erroneous proceedings against an infant or person of unsound mind, when the condition of such defendant does not appear in the record, nor the error in the proceedings.

"* * *

"7. For unavoidable casualty or misfortune, preventing the party from prosecuting or defending."

There are 10 statutory grounds set forth in said section. We quote only No. 5 and No. 7 because they are the only two urged. The court now eliminates No. 5 from consideration, not because it may not have merit but because No. 7 is so decisive it is not necessary to consider No. 5.

It is too well recognized to be disputed that unsoundness of mind is such misfortune. 1 Freeman on Judgments (1925) 440-441, Sec. 224, 507, Sec. 250; Bushwell on Insanity (1885) 156, Sec. 131; Bean v. Haffendorfer Bros., 84 Ky 685, 692-694, syl. 2; Small v. Reeves, 104 Ky. 289, 294 syl. 1; Southern National Life Ins. Co. v. Ford's Admr., 151 Ky 476, 482-483; Herlihy v. Kane, 310 Mass. 457, 459; Swetland v. Swetland, 100 N. J. Eq. 196, 211; Gephart v. Block, 14 Abs. 163; 34 C. J. 314, Sec. 534, n. 23 (g); Pulaski County v. Hill, 134 S. W. 973, 975, syl. 4. Question has been raised as to whether, in the statute, the

adjective "unavoidable" applies to "misfortune" as well as to "casualty." It is not necessary to determine that here because the court finds that the defendant's misfortune of unsoundness of mind is unavoidable.

Because the fifth ground for vacating a judgment under §11631 GC, also relates to unsoundness of mind and because the instant facts may not qualify on the fifth ground, do not prevent their qualifying on the seventh ground. Bean v. Haffendorfer Bros., 84 Ky. 685, 693-694. Sec. 11631 GC provides ten grounds for vacating a judgment after term. Each is sufficient to do the trick. Each is composed of a number of elements. Some of these grounds have an identical element in common but they have other elements not in common. Thus grounds No. 5 and No. 8 have the element of infancy in common; No. 5 and No. 8 the element of error; No. 4 and No. 10 the element of fraud. Though a set of facts does not qualify on one ground, it may qualify on another if it has all the elements of the latter even though the latter may have an element in common with the former.

Before the unsoundness of mind contemplated by such seventh ground can justify vacating this judgment on that ground, that unsoundness must have prevented defendant from defending. The court finds that defendant's unsound mind did prevent him from defending. This was more than a mere indifferent, obstreperous or negligent mind. It was a mind that could not reason, had no understanding, had not the power to cooperate, about this very thing, i. e., defending this action. Once previously this action was called into a court room for trial. It was necessary to postpone the trial when defendant's then counsel could not reason with him and defendant talked about jumping out of the window. Defendant was suffering from such mental deficiency that he was "unable to look into his affairs, properly consult with counsel, prepare and present his case, and assert and protect his rights in a court of justice." **Lowe v. Union Trust Co., 124 Oh St 302, syl. 1.**

To pretend that a trial which is ex parte and in which defendant does not appear and no one appears for him, is a defended action, would be mockery. To pretend that a pleading on file makes it a defended action would be further mockery. Otherwise, defense trial lawyers receive compensation under false pretenses. Otherwise, we should expunge from the law as unimportant the rights to a day in court, to be present and represented by counsel, to offer evidence, to cross-examine plaintiff and his witnesses, to object, etc.

Defendant's derangement prevented him from defending this action just as effectively as if he and his counsel had

been kidnapped by some maniac on the court house steps while on their way to the trial. Because defendant was a prisoner of his own unsound mind makes him no less a prisoner, makes this action no less undefended.

In addition to authorities cited above, we cite the following. They brace one or more angles for our conclusion. Haywood v. Haywood, 4 N. C. 204; Cornwell v. Cornwell, 118 F. (2d) 396; Lamprey v. Nudd, 29 N. H. 299, 303; Bergh v. Hellickson, 44 N. D. 9, syl. 2; Clandy v. Caldwell, 106 Ind. 256; McClain v. Davis, 77 Ind. 419; Dickerson v. Davis, 111 Ind. 433, 436, 437; Judd v. Gray, 156 Ind. 278, syl. 3; Manzi v. Carlson, 278 Mass. 267, 273-274; Brothers v. Brothers, 71 Mont. 378; Gerster v. Hilbert, 38 Wis. 609, 612; Bond v. Neuschwander, 86 Wis. 391.

We are not concerned with whether a person of unsound mind can be sued (22 **O. Jur. 88, Sec. 43;** 44 C. J. S. 291, Sec. 134), or what the duty of the court or the opposing party is if it appears that the defendant is of unsound mind (22 **O. Jur. 89, Sec. 44, 94, Sec. 51; Johnson v. Pomeroy, 31 Oh St 247, 248;** 44 C. J. S. 290-291), or whether a default judgment should be taken against such a defendant (22 **O. Jur. 94-95, Sec. 52;** 44 C. J. S. 326, Sec. 151; Taylor v. Lovering, 171 Mass. 303, 305-306), or whether a judgment against a defendant of unsound mind is void or only voidable (22 **O. Jur. 94, Sec. 51; Johnson v. Pomeroy, 31 Oh St 247, 248)** or under what circumstances equity grants relief against such a judgment (**Johnson v. Pomeroy, 31 Oh St 247, 249**). Starting with a judgment already rendered, we are concerned only with whether it may be vacated after term under **Par. 7 of §11631 GC,** because unsoundness of mind prevented defendant from defending. We believe it can.

Before the court can vacate this judgment it must, under §11637 GC, adjudge that there is a valid defense. **Lutkenhouse v. Vella, 42 Abs 520; 23 O. Jur. 1245-1248, Secs. 1175, 1176.** This the court does. **9 O. Jur. 248-249, Sec. 13, 284, Sec. 51; 22 O. Jur. 66-69 (Insane Persons, Etc.—Chap VI on Contracts Generally) Secs. 22-28, Pg. 76-81, Secs. 33-36;** 17 C. J. S. 479-484, Sec. 133; 44 C. J. S. 270, Sec. 109, 277, Sec. 116; 6 **O. Jur. 520-524, Secs. 19, 22.** In Dickerson v. Davis, 111 Ind. 433, 436-437, it says:

"The protection of persons who are so unfortunate as to be bereft of reason and incapable of managing their own estates, is of higher obligation, and an object more to be cherished by the courts, than is the protection of holders of commercial paper, however innocent they may be (many citations). There can be no contract unless there is a meeting of the minds; and there can be no meeting of minds if

the one party has no mind which can meet the mind of the other."

There is one other question. At the hearing, plaintiff objected to Attorney Apple, former counsel for defendant, testifying, on the ground that the matters about which he proposed to testify were privileged communications between client and attorney and that §11494 GC prohibits him from testifying. It reads:

"The following persons shall not testify in certain respects: 1. An attorney, concerning a communication made to him by his client in that relation, or his advice to his client * * *. But the attorney * * * may testify by express consent of the client * * *."

The guardian of defendant's person and estate claimed that the matters in question were not privileged communications. We assume, without deciding, that they were privileged. Moreover, defendant's guardian purported to waive the privilege upon behalf of his ward. Plaintiff contended that the guardian had no power to waive the privilege—that it was a personal privilege which could be waived only by the client himself, but that this particular client couldn't waive it personally because he was an incompetent under guardianship.

Plaintiff cites **Swetland v. Miles, 101 Oh St 501,** which holds that in a will contest case, said section prohibits decedent's attorney from testifying as to privileged communications with decedent, and that neither the decedent's personal representative nor heirs can waive the privilege. In **Industrial Commission v. Warnke, 131 Oh St 140,** the Supreme Court created an exception to the Swetland case to the extent of allowing a widow-claimant in an action against the industrial commission to waive the similar statutory physician-patient privilege. Other Ohio courts later refused to extend this exception in non-Workmen's compensation cases involving decedents. **Russell v. Penn Mut. Life Ins. Co., 70 Oh Ap 113; Thompson v. National Life & Accident Ins. Co., 68 Oh Ap 439; Parisky v. Pierstorff, 63 Oh Ap 503.**

Our case is drastically distinguishable. This client is not dead! The very purpose of this statute is to protect the client. A dead client may need no protection. A live one does, whatever his condition. The statute protects the client in two ways—one by preventing the lawyer from testifying, the other by enabling the lawyer to testify. To a live client, one is as important as the other. Even more important is the fact that the client is given a choice between the two, because, in a certain instance, either could oppress instead of protect.

The live client is as much entitled to the one as to the other. Nothing denies him the benefit of either simply be-

cause he becomes incompetent. Do we discriminate against the incompetent, denying him the one right he may need most?

In pretense of protecting the incompetent, how can we actually deny him protection? Is the option which belongs to the client as long as he is competent, to be turned over to his opponent when client becomes incompetent? If so, try to explain it to a layman in a way that will give him confidence in courts and justice. In the name of upholding "for the incompetent" a "privilege" which in no real sense is a privilege, are we to sanction the shocking spectacle of sending his cause to the gallows?

Client's right may be a personal privilege, but a guardian does many responsible things for his ward, both in and out of court, as personal and important as this. See article on Guardian And Ward in 20 O. Jur. It is his duty to "defend, or cause to be defended, all suits against his ward." (Sec. 10507-15 GC; 20 O. Jur. 292-293, Sec. 75) A guardian who defends a person under disability is not a bump-on-a-log champion. He is a two-fisted combatant. Bennett v. Fleming, 105 Oh St 352, 359, syl. 3; Hasty v. Weller, 19 O. O. 304, 306-307, 33 Abs 190, 192-194. The law does not require him to fight, then deny him ordinary weapons.

In reason, who more logically should exercise this existent right to protect the ward by authorizing his lawyer to testify than the one whom the court has specially appointed to protect the ward—his guardian!

If it is said that the guardian should apply to the Probate Court for authority to do this, then must the guardian also ask the Probate Court to instruct it about every ordinary detail of trial—whether it can file a motion or demurrer—what arguments and citations it may present—whether it can take depositions—what questions it may ask on voir dire—whether it can waive any of its peremptory challenges—whether it can issue a subpoena—whom it may call as witnesses—whether it can waive cross-examination, etc.?

Not in the whole United States have we been able to find a case exactly in point. There are some close, well-reasoned analogies however, such as the recognized right of a parent as natural guardian to waive a similar, statutory, physician-patient privilege as to an infant. Corey v. Bolton, 97 N. Y. S. 915; State v. Depositer, 21 Nev. 107; Jenkins v. State, 146 Miss. 339; 70 C. J. 462, Sec. 627.

We think the guardian had the power to consent to Attorney Apple testifying.

Accordingly, an entry may be drawn vacating the judgment.