OLSON  v. RASMUSSEN.

1. DEEDS—ADEQUACY OF CONSIDERATION—EVIDENCE.

   In suit to set aside deed of incumbered 80-acre farm worth
   $1,000 to $1,500 and bill of sale of $500 worth of personal
   property thereon, executed by 78-year-old widower, living
   alone, to neighbors across the road in return for care al-
   ready given him and agreement to care for him during the
   remainder of his life, inadequacy of consideration was not
   shown where it appeared that defendants had assumed the
   mortgage on the property, cared for grantor, assumed about
   $200 funeral expenses and all taxes and liens, although grantor
   lived less than a month after the deed was executed.

2. SAME—CONSIDERATION.

   A deed of conveyance, being a contract under seal, imports
   a consideration.

3. CONTRACTS—CANCELLATION OF INSTRUMENTS—ADEQUACY OF CON-
   SIDERATION—FRAUD.

   Mere inadequacy of consideration, not accompanied by other
   elements of bad faith, will not warrant cancellation of a
   contract, unless so inadequate as to furnish convincing evi-
   dence of fraud, or unless so grossly inadequate as to shock the
   conscience of the court.

4. DEEDS—UNDUE INFLUENCE—EVIDENCE.

   Undue influence was not shown in suit to set aside a deed of
   an incumbered 80-acre farm worth from $1,000 to $1,500 and
   bill of sale of $500 worth of personal property thereon, which
   appear to have been voluntarily executed by a 78-year-old
   widower, living alone, to neighbors across the road, after he
   had ended negotiations with plaintiff, an unmarried stepson,
   and with which arrangement grantor had expressed his satis-
   faction after it had been agreed upon.

5. SAME—MENTAL CAPACITY—BURDEN OF PROOF—NEIGHBORS.

   In suit to set aside a deed by elderly grantor to neighbors across
   the road wherein he reserved a life interest, burden of show-

ing lack of mental capacity on part of grantor was on plaintiffs where grantees did not occupy a fiduciary relation to grantor.

6. SAME—MENTAL CAPACITY—BURDEN OF PROOF—EVIDENCE.

In suit to set aside a deed and bill of sale by elderly grantor to neighbors across the road, wherein he reserved a life interest, burden of showing lack of mental capacity to execute instruments was not shown by plaintiff creditor in view of testimony of physicians who examined him the day before and the day deed was executed, the scriveners, the witnesses to the instruments and the housekeeper who took care of grantor for his remaining days, to the effect that he was mentally alert at the time instruments were executed.

7. APPEAL AND ERROR—QUESTIONS REVIEWABLE—CANCELLATION OF INSTRUMENTS—CREDITORS.

Where creditors failed to set forth circumstances under which deed of farm and bill of sale of personalty thereon to neighbors, executed by elderly widower in return for care for himself, question as to propriety of creditor bringing action without first having an administrator appointed and claim allowed in probate court is not discussed.

8. DEEDS—COURTS.

Courts are not permitted to make equitable distribution of property but are concerned only with giving effect to the legal acts of decedents.

Appeal from Alcona; Dehnke (Herman), J. Submitted January 5, 1943. (Docket No. 19, Calendar No. 42,157.) Decided April 6, 1943.

Bill by Myrto Alfred Olson and by Jenny Gillard, administratrix of the estate of Alex Ellison, deceased, against Theodore Rasmussen and Anna, his wife, to set aside a deed of conveyance and bill of sale on grounds of incompetency of grantor, undue influence, and inadequacy of consideration. Decree for plaintiffs. Defendants appeal. Reversed.

*William R. Barber,* for plaintiff Olson.

*Donald K. Gillard,* for plaintiff Gillard.

*Isadore Isackson,* for defendants.

BOYLES, C. J.   In this case plaintiffs ask the court to set aside a deed and bill of sale executed by one Alex Ellison to defendants.   The grounds on which plaintiffs seek the cancellation are (1) that the grantor "was in a condition of great mental weakness, and had not sufficient capacity to understand in a reasonable manner the nature and effect of his acts, and more especially the act of executing the deed of conveyance to the defendants herein;" (2) that defendants procured the deed "through undue influence and without consideration;" (3) that there was a "gross inadequacy of consideration for said conveyance."   Defendants appeal from a decree granting the relief sought.

In 1940, the grantor, Alex Ellison, 78 years of age, owned 80 acres of land in Alcona county, partly under water.   Testimony as to its value ranged from $1,000 to $1,500.   The Federal land bank held a mortgage on the place, with about $500 unpaid but not due.   Ellison also owned some farm tools and animals, worth about $500.   He was sick and alone, had been told by a physician he had only three months to live.   None of the parties herein was related to him.   Prior to 1910, he had married the mother of defendant Theodore Rasmussen, and after her death he married the mother of plaintiff Myrto Olson, who died in 1938.   Since that time he lived mostly alone on the farm.   Plaintiff Myrto Olson, unmarried, at various intervals had lived with Ellison, when unemployed.   He was a sailor, and at times in the coast guard.   The Rasmussens, defendants herein, were Ellison's neighbors, on a farm across the road.   In the spring of 1940, Myrto

Olson went sailing. Ellison failed in health. In October, there were some negotiations between Ellison and Olson about deeding the farm to Olson, but these were broken off by Ellison. Ellison and the Rasmussens were very friendly, the Rasmussens frequently looked after Ellison and took care of him. After Ellison decided not to deed the farm to Myrto Olson, he asked the Rasmussens to take the farm and take care of him. In fact for several years, he had been asking the Rasmussens to do this. On November 12, and again on November 13, 1940, Ellison and Rasmussen went to a physician's office in Alpena where they were informed that Ellison had a cancer of the stomach. On November 13th, they went to the office of an attorney in Alpena, and Ellison executed and delivered to the Rasmussens a conveyance of the farm.

This deed contained the following reservation:

"Reserving unto the grantor a life estate in said premises.

"The said grantor hereby reserves to himself the right of his comfortable maintenance upon the within described premises in the family of the grantees, during his natural life, and the said grantees shall not sell or convey the within described premises, during the natural life of the said grantor, without his consent.

"The said grantees hereby agree to pay and assume all taxes, special assessments, liens and incumbrances existing on date hereof."

A week later Ellison gave defendants a bill of sale of his personal property. The Rasmussens moved in and took care of him until his death on December 9th.

The question for decision is, whether the deed and bill of sale should be set aside because of undue influence, mental incapacity, or gross inadequacy of

consideration. As to plaintiffs' claim of inadequacy of consideration, we have no hesitation in holding that plaintiffs have not made out their case. Defendants had been caring for Ellison before the deed was given. They assumed the risk of agreeing to continue doing so for his lifetime, whatever it might be. They fully performed their obligations, assumed about $200 funeral expenses, all taxes and liens, and assumed the mortgage on the place. Plaintiffs make no claim of a *total* lack of consideration. The deed of conveyance (a contract under seal) imported a consideration. *Dye* v. *Mann,* 10 Mich. 291. Mere inadequacy of consideration, not accompanied by other elements of bad faith, will not warrant cancellation of a contract, unless so inadequate as to furnish convincing evidence of fraud (*Van Norsdall* v. *Smith,* 141 Mich. 355), or unless so grossly inadequate as to shock the conscience of the court (*Hake* v. *Youngs,* 254 Mich. 545). In a proceeding to enforce an oral farm land contract, where an elderly couple had agreed with the plaintiff that if he would continue to operate their farm, improve it, furnish them a yearly consideration, and look after them in their old age, the farm would be his after they were through with it, and where the plaintiff had fully performed his part of the agreement, this court said:

"Much space has been devoted in the briefs arguing the question of inadequacy of consideration, and it is asserted by counsel that what plaintiff received, aside from the farm, more than paid him for what he did for the Burnhams. It was not necessary that the consideration should be adequate. When the contract was made the Burnhams were over on the western slope of life. They wanted someone to look after and care for them in their old age. They had no children to do this, so they naturally turned to a stranger. * * * If Mr.

Burnham was satisfied with the manner in which plaintiff discharged his obligations under his contract, his heirs must be content also." *Woodworth v. Porter*, 224 Mich. 470, 475.

We have searched the record in vain for any substantial proof that the defendants exerted or attempted to exert any influence on Ellison to convey his farm and personal property to them. When he concluded to end his negotiations with Myrto Olson he voluntarily turned to his neighbors, the defendants herein. They had been very friendly for many years, and Ellison had on several occasions asked them to take his property and take care of him. After this had been agreed upon, Ellison expressed his satisfaction with the arrangement. It was the result of his own expressed desire and entered into of his own free will. There was no undue influence.

Was the mental condition of Alex Ellison at the time the deed (and later the bill of sale) was executed such that he was not fully capable of understanding the nature of his acts and the results? There was no fiduciary or other relationship between Ellison and the defendants, and the burden of proving such lack of mental competence is on the plaintiffs. The proofs adduced on this issue, in addition to those already indicated herein, were briefly as follows:

In October, 1940, Ellison was advised he had arteriosclerosis; he sent Mrs. John Olson to Myrto Olson to make a deal; Myrto wrote Ellison he would pay household expenses, keep up the house; Ellison said "That is exactly what I want to do," sent word to Myrto he would deed him the property if he (Myrto) would take care of him. Myrto was then employed elsewhere. A few days later (in October), Ellison told Mrs. John Olson he had changed his mind, would wait until Myrto came back, and

would think over the proposition. A few days later, Ellison became more seriously ill. He was 78 years of age, in dire need of care and attention. He asked his neighbors, Rasmussens, to come and take care of him, which they did. On November 12th, Ellison consulted competent physicians at Alpena and on his return to them the next day they diagnosed Ellison's ailment as cancer. As to his mental condition at that time, Dr. Foley testified:

"*Q.* At the time that Mr. Ellison was brought up to your office did you notice anything peculiar or anything out of the way about his mental condition?

"*A.* No. I took his history and he gave a history like any other individual.

"*Q.* He appeared to be interested in his case, I take it?

"*A.* Yes, he was very much interested in his case, and in fact he insisted on knowing what was the matter with him, which I didn't like to tell him because you never like to tell a fellow that he is not going to last very long."

After testifying that Ellison also had arteriosclerosis, Dr. Foley further testified:

"*Q.* And isn't it a fact that in some cases, and in most cases of arteriosclerosis, where it is pronounced, at an advanced age, that a patient is irrational at times and rational at other times?

"*A.* Not necessarily, no.

"*Q.* But it is so in some instances?

"*A.* There have been instances where it is. * * *

"*Q.* Was it so in this case, Doctor?

"*A.* Well, this man was perfectly rational. He gave a rational history, and he was as alert mentally as most men at that age."

The other examining physician, Dr. Bunting, testified:

"*Q.* During the course of this examination did you notice anything peculiar about his mental condition?

"*A.* Nothing whatsoever.

"*Q.* Did he appear to be mentally alert?

"*A.* He was quite alert. He discussed the progress of his chief complaints quite thoroughly with us as we did the mechanics of the fluoroscopy and answered our questions intelligently and quite wholly. He tried to give us a complete picture as he thought we needed to know it, because he did want to be helped.

"*Q.* Is it any reflection upon a man's condition or has it any bearing on a man's mental condition, say a man of 78 years of age, if he might happen to talk a little too loudly or excitedly, would that have any bearing upon his mental condition?

"*A.* Under what circumstances?

"*Q.* Well, for instance if he was in a doctor's office.

"*A.* I believe that if any of us were in a doctor's office and perhaps subconsciously knew we were facing a verdict of death which might be forthcoming, we would all be nervous.

"*Q.* And possibly talk a little excitedly?

"*A.* Yes, sir.

"*The Court:* But this particular proposition that was testified to was this: that while he was waiting in the ante room he was telling other people, strangers to him, everything about himself without reserve.

"*The Witness:* We see that quite often, sir. * * *

"*Q.* Does that have any bearing on the patient's mental condition?

"*A.* I would not feel that that one little thing

should be allowed to lead us astray in any direction."

On this same day, Ellison and defendant Theodore Rasmussen went to a law office in Alpena where Ellison conveyed the farm in question to the defendants. As to Ellison's mental condition, the attorney who prepared the conveyance testified:

"According to my recollection, Mr. Ellison was an elderly man, sort of weatherbeaten, a man that had probably spent most of his life out in the open. He wanted to have the deed prepared running to Mr. and Mrs. Rasmussen and reserve his right to the premises as long as he lived and I drew this deed in the form of a life estate to Mr. Ellison and conveying a fee title to the grantees named in the deed here.

"*Q.* You note on that deed a provision to support Mr. Ellison during his lifetime? I would like to have you tell the court what conversation occurred in your office with reference to that particular provision.

"*A.* Well I remember the provision—the language there—that he wanted to be assured that he would have the right to use these premises during his natural life, and that on his death the property would automatically—at least his life estate would be wiped out and the absolute title would be in the Rasmussens.

"*Q.* After the execution of the deed what if anything did Mr. Ellison say—what remarks did he make?

"*A.* Well I don't recall any special remarks except that he wanted my assurance—the only thing that I can remember—I don't recall the exact words of the conversation—I can remember that he wanted my assurance. I just spoke about that the life estate of the property would be reserved to him during his lifetime and on his death the title would be absolute in the Rasmussens. That is the only thing

I remember about it. But I think he did say—this is my recollection—that he wanted somebody to help him out, that he was getting old and wasn't feeling just up to date, and he wanted somebody to help him out there, and that is about all I remember.

"*Q.* What can you say in regard to Mr. Ellison's mental condition at the time of the execution of this deed?

"*A.* Well that is a sort of hard question to answer—

"*By the Court:*

"*Q.* You didn't know at the time there would be any question raised about it?

"*A.* No, I didn't, he told me what he wanted and I went ahead and did it the best I could at that time. I didn't notice anything unusual about the deal at all.

"*Q.* You didn't notice anything unusual about the man?

"*A.* No, sir.

"*Q.* Or peculiar about his actions?

"*A.* No, sir.

"*Q.* And so far as the transaction that occurred in the office, there was nothing that led you to believe that deed was being executed under duress?

"*A.* Well if it had been I certainly would not have been a party to the transaction.

"*Q.* As far as you are concerned the drafting of that deed was no different from any other transaction of that nature?

"*A.* That is correct.

"*Q.* From your conversation—and I know it is difficult to remember these things months afterwards—what occurred in your office—was there anything to lead you to gain the impression that Mr. Ellison was not right mentally?

"*A.* No, nothing at all. The only thing that seemed to me that Mr. Ellison was not enjoying the best of health."

Exactly one week later, Ellison signed a short bill of sale transferring his personal property to defendants. The justice of the peace who prepared this instrument, and one of the witnesses who signed it as such, both disinterested parties, testified that Ellison was rather weak, in bed, talked fairly plainly, appeared to know what he talked about, conversed intelligently about things that had happened two or three years back. They conversed with Mr. Ellison and testified he seemed all right. Another witness, a housekeeper, testified she went to Ellison's house November 17th, stayed there until December 8th (the day before he died), helped do housework and take care of him, talked with him, that he was able to talk to her intelligently, she noticed nothing peculiar about his mental condition until the last day, that he appeared to be all right mentally, she couldn't see anything wrong with him. Other witnesses testified to a similar effect. Nothing of advantage is to be gained by a further recital of the testimony. Outside of inferences, there is not much in the record to controvert the above testimony.

Plaintiff Myrto Olson produced considerable testimony as to the friendly relations between Ellison and himself, and as to the various things he had done for Ellison, furnished him money and groceries, helped pay Ellison's debts, and that Ellison had said Olson was to have the farm. But Olson is not here seeking to have the conveyance set aside and specific performance of an oral agreement to convey to him. He files his bill of complaint as a creditor of Ellison's estate, asks that the transactions with defendants be set aside and the property declared to belong to Ellison's estate. Plaintiffs do not assert, nor have they proven, that the deed and bill of sale were fraudulent conveyances, or for the

purpose of defrauding creditors. In view of our conclusion that the deed and bill of sale were not the result of undue influence or lack of mental capacity and that the consideration was not grossly inadequate, we need not discuss whether Myrto Olson could bring the action as an individual creditor without first having an administrator appointed and his claim allowed in probate court.

Alex Ellison had the undeniable right to dispose of his property, both the farm and his personalty. Age does not deprive an individual of that right. He knew what he wanted to do, and accomplished it in a legal manner. In *Francisco* v. *Heaslip,* 273 Mich. 444, Mr. Justice BUSHNELL, in reviewing a decree that had set aside a deed in a similar case, wrote the law peculiarly applicable to the case at bar:

"While we are loath to set aside the findings of the trial court who saw the witnesses and heard their testimony (*Perry* v. *Coleman,* 255 Mich. 524, and *Navarre* v. *Raupp,* 267 Mich. 173), yet the object of the bill being to set aside a deed on the ground of incompetency on the part of the grantor and undue influence on the part of defendants, the burden of proving the charge by a preponderance of evidence primarily rests upon complainant, and if the testimony does not prevail in his favor or is so evenly balanced as to leave the question of doubt, his suit must fail. *Reagan* v. *Murray,* 176 Mich. 231, and authorities therein cited at page 237.

" 'Fraud, undue influence and mental incompetency are primarily questions of fact with the burden of proof resting upon them. As presented by this record fraud and undue influence are contingent upon the issue of the deceased's mental competency. In the absence of the latter even the claimed inferential evidence of the former disappears. Opportunity alone affords no inference.' *Powell* v. *Pennock,* 198 Mich. 573, 580.

"Courts are not permitted to make equitable distribution of property but are concerned only with giving effect to the legal acts of decedents. *Pritchard* v. *Hutton*, 187 Mich. 346."

Reversed. Appellants may have a decree dismissing the bill of complaint, with costs.

CHANDLER, NORTH, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.