## DAANE v LOVELL

Docket No. 77-773. Submitted November 8, 1977, at Grand Rapids.—
Decided May 10, 1978. Leave to appeal applied for.

Bertha Lehto, plaintiff's ward, executed a deed to her farm
granting the remainder to her niece, Angela Lovell, and keep-
ing a life estate for herself. Some 2-1/2 years later Homer
Daane, guardian of the estate of Bertha Lehto, brought suit
against Angela Lovell for cancellation of that conveyance alleg-
ing undue influence and failure of consideration. The Manistee
Circuit Court, Charles A. Wickens, J., found the conveyance to
be a valid gift. Defendant appeals. *Held:*

1. Under the facts in this case the Court of Appeals is not left
with the firm and definite conviction that the trial court erred
in concluding that there was no undue influence.

2. Under the facts of this case the trial court rightly con-
cluded that the deed was intended as a gift, valid even in the
absence of consideration.

Affirmed.

D. E. Holbrook, J., dissented. He would hold that under the
facts of this case the plaintiff sustained his burden of proof of
undue influence and that the consideration was so inadequate
as to shock the conscience of the court and necessitate cancella-
tion of the deed.

### Opinion of the Court

1. Appeal and Error—Chancery—Judicial Review—Findings of
   Fact—Clearly Erroneous.

   Chancery cases are reviewed *de novo,* examining the entire
   record, weighing all the evidence and subjecting the trial
   court's findings of fact to closer scrutiny than would be em-
   ployed in review of a jury verdict; consideration in such cases is
   given to the trial court's opportunity to better judge the credi-

REFERENCES FOR POINTS IN HEADNOTES

[1] 27 Am Jur 2d, Equity § 266.
[2, 4] 23 Am Jur 2d, Deeds §§ 148–152, 154.
[3, 5] 23 Am Jur 2d, Deeds § 61 *et seq.*

bility of witnesses who appeared before it and the trial court's findings of fact will not be set aside unless clearly erroneous; that is, unless the Court of Appeals is left with a definite and firm conviction that a mistake has been made.

2. DEEDS—UNDUE INFLUENCE—EVIDENCE—PRESUMPTIONS—FIDUCIARIES.

A presumption of undue influence in the execution of a deed is brought to life upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction; establishment of such a presumption creates a "mandatory inference" of undue influence, shifting the burden of going forward with the evidence to the party claiming no undue influence.

3. DEEDS—GIFTS—ADEQUACY OF CONSIDERATION.

A deed is valid even absent consideration where the transaction was intended as a gift.

DISSENT BY D. E. HOLBROOK, J.

4. DEEDS—UNDUE INFLUENCE—PRESUMPTIONS—BURDEN OF PERSUASION.

*A plaintiff alleging that a deed was invalid as the product of undue influence may satisfy the burden of persuasion with the use of the presumption of undue influence, which remains as substantive evidence once the elements of the presumption have been proved, where the defendant fails to discharge his duty to produce sufficient rebuttal evidence to overcome the presumption.*

5. DEEDS—ADEQUACY OF CONSIDERATION—JUDICIAL REVIEW.

*A deed will be set aside if the consideration is so grossly inadequate as to shock the conscience of the court.*

*Running, Wise & Wilson* (by *T. J. Phillips, Jr.),* for plaintiff.

*Jennings & DeVries,* for defendant.

Before: R. B. Burns, P. J., and D. E. Holbrook
and R. B. Martin,* JJ.

Per Curiam. Plaintiff's ward, Bertha Lehto,
gave her niece, Angela Lovell, a deed to her farm,
retaining only a life estate. Plaintiff brought suit
for cancellation of the deed, alleging undue influ-
ence and failure of consideration. The trial court
held that the deed was a valid gift. We affirm.

In this chancery case we review *de novo,* exam-
ining the entire record, weighing all of the evi-
dence and subjecting the trial court's findings of
fact to closer scrutiny than we would employ on
review of a jury verdict. *Kar v Hogan,* 399 Mich
529, 546; 251 NW2d 77, 82 (1976), *Tuttle v Depart-
ment of State Highways,* 397 Mich 44, 46; 243
NW2d 244, 245 (1976). Consideration is given to
the trial court's opportunity to better judge the
credibility of witnesses who appeared before it.
GCR 1963, 517.1. The trial court's findings of fact
will not be set aside unless clearly erroneous; that
is, unless we are left with a definite and firm
conviction that a mistake has been made. GCR
1963, 517.1, *Tuttle v Department of State High-
ways, supra, Mazur v Blendea,* 74 Mich App 467,
469; 253 NW2d 801, 802.(1977).

Prior to 1972, Mrs. Lehto lived on the farm with
her husband. They had no children, but Mrs.
Lehto did have sisters, a brother and numerous
nieces and nephews, some of whom lived in the
vicinity. Although the Lehtos visited with many
relatives and friends, they saw Mrs. Lovell and her
husband most, visiting them on holidays and often
for dinner on Sundays. Mrs. Lovell was Mrs. Leh-
to's favorite "fair-haired niece".

The Lehtos' income consisted of social security

---

* Circuit judge, sitting on the Court of Appeals by assignment.

and soil bank payments. To qualify for soil bank payments, Mr. Lehto kept several acres of the farm in crops each year. Mr. Lehto handled all of the couple's financial affairs.

Mrs. Lehto suffered a stroke in 1969, and was comatose for nearly a week. During her hospitalization Mrs. Lovell, who worked at the hospital, helped care for her. Mrs. Lehto subsequently made a good physical recovery, but suffered thereafter from forgetfulness. This caused her to have difficulty managing some things, particularly financial matters. Occasionally her imagination would get away from her, causing her to say things which were not true. A doctor who examined her in 1974 concluded that she was alert as to time and place, but exhibited "slight paranoid tendencies" and overconcern with financial matters.

In 1971, Mr. and Mrs. Lehto executed similar wills, leaving to each other the farm, but providing that if either predeceased the other, then Mrs. Lovell would receive the farm. They did so because Mrs. Lovell had shown them more consideration than anyone else, and because she had cared for Mrs. Lehto in the hospital. Mrs. Lovell was informed of the provision they had made for her in the will.

Mr. Lehto died June 6, 1973. Mr. Lovell took Mrs. Lehto to the local social security office in order to adjust benefits. The office suggested that Mrs. Lehto appoint someone to accept and deposit her social security checks for her. Mrs. Lehto appointed Mrs. Lovell, who had not requested the appointment but nonetheless consented to it. She opened a joint account, in order that she would be able to write checks on the account should Mrs. Lehto become incapacitated. Mrs. Lovell thereafter deposited the social security in the account, and

Mrs. Lehto wrote checks on the account to pay her bills. For several years after Mr. Lehto's death, Mr. Lovell helped Mrs. Lehto by planting several acres of crops per year to qualify Mrs. Lehto for soil bank payments, mowed her yard and repaired her barn.

On August 10, 1973, Mrs. Lehto deeded her farm to Mrs. Lovell, retaining a life estate. The circumstances surrounding the transfer were disputed at trial.

Dennis Keleher testified that he was Mrs. Lehto's attorney, and had had a conference with her several days prior to the transfer, either in person or by telephone. Mrs. Lehto had requested that he draft a new will, eliminating reference to her deceased husband, changing the residuary beneficiaries, naming Mrs. Lovell executrix, and continuing unchanged the grant to Mrs. Lovell of the farm. On August 10 Mrs. Lehto came to his office, in the company of Mr. and Mrs. Lovell, and executed her will. Mrs. Lehto was concerned about avoiding the cost of probating the farm, and "they" had agreed upon an immediate conveyance to Mrs. Lovell, with a life estate remaining in Mrs. Lehto. Mr. Keleher made sure that Mrs. Lehto understood the significance of what she was doing, taking substantial time to explain that the conveyance would be irrevocable, and explaining alternate methods of accomplishing her intent. Someone had mentioned that Mr. Lovell was doing some work for Mrs. Lehto, so he suggested a contract requiring Mr. Lovell to continue the work in exchange for the conveyance. Mrs. Lehto rejected this alternative because the cost of preparing the contract would be too great. The instructions regarding the deed came from Mrs. Lehto, not the Lovells, and he noticed nothing which would indicate incompetency or undue influence.

Mrs. Lehto testified that she had the will made out, but Mr. and Mrs. Lovell didn't like it, so they rushed her down to Mr. Keleher's office, not stopping to see if anyone would go with her. On the way there, Mrs. Lovell told her that they would take care of her for the rest of her life. When they arrived, Mr. Keleher had the deed already prepared, so that the Lovells had cooked up the transfer with Mr. Keleher beforehand. She asked Mr. Keleher what was on the paper, but she didn't understand what he said. All of his advice was so complicated she didn't understand a word of it. Something was said about the Lovells taking care of her, but Mrs. Lovell spoke up and said she wouldn't take care of her. Mrs. Lehto was afraid that, if she didn't sign the deed, she would lose her soil bank money. "I thought they would do that for me, so I signed it." Indeed, it was her intent that, in exchange for giving Mrs. Lovell the farm in both the 1971 and 1973 wills, the Lovells would care for her for the rest of her life.

Mrs. Lovell testified that, on August 10, Mrs. Lehto called and asked her to take her to Mr. Keleher's office. Mrs. Lehto had asked Aunt Elsie to take her, but Aunt Elsie had other commitments. They had no conversation regarding either the will or the deed on the way to the office, and she did not know why they were taking Mrs. Lehto to the office until they had arrived.

Mr. Lovell testified that they took Mrs. Lehto to Mr. Keleher's office to have her will "verified". Neither he nor his wife told Mrs. Lehto that, if she didn't sign the deed, she would lose money. They made no promise to care for her.

Mr. Keleher's secretary testified that she typed out the deed the same day Mrs. Lehto and the Lovells came to the office.

At some point subsequent to the execution of the deed, the relationship between Mrs. Lehto and the Lovells soured. Mrs. Lehto had been writing checks to pay her bills, but was continuously overdrawing her account. Mrs. Lovell determined that a different arrangement was necessary, so she started putting the checks in her own account, paying Mrs. Lehto's bills, and keeping track of Mrs. Lehto's money in a ledger. When Mrs. Lehto requested money for a special purpose, she would give it to her. Mrs. Lovell took care of Mrs. Lehto's bills in this manner from December 1974 to February 1976.

Mrs. Lehto became dissatisfied with this economic relationship. First, she did not have readily available "pin" money, and could not give money at her church. She had to ask Mrs. Lovell for everything, and Mrs. Lovell seemed unresponsive. Further, she was unhappy that she had to continue to pay taxes and insurance on the property, even though the Lovells "owned it".

Perhaps the culmination of Mrs. Lehto's dissatisfaction was an incident involving the sale of some Christmas trees. Mrs. Lehto testified that a man came to her and asked to buy some Christmas trees. He went out and marked some trees, and later returned and removed them. She didn't recall how many trees he took, or how much he paid. When the Lovells came over and she told them about the man, they "gave me heck", pinched her, and pulled at her clothes, saying she had no business selling the trees. The Lovells testified that Mrs. Lehto had previously become confused regarding payment on the sale of a tractor. They did not object to the sale of the Christmas trees, but asked her why she did not confide in them so they could help account for the trees. Mrs. Lehto

became very belligerent, and it became necessary for Mr. Lovell to restrain her by holding her arms down. They didn't pinch her or pull at her clothes.

Mr. Keleher saw Mrs. Lehto again September 30, 1974, and determined that Mrs. Lovell was no longer the "fair-haired niece". It seemed that Mr. Lovell had not plowed, so that Mrs. Lehto did not receive payment from the soil bank. Mrs. Lehto was also dissatisfied with Mrs. Lovell's handling of her money, and wanted to manage her own affairs.

The trial court found that the deed was intended as a gift, and that there was no contract for the Lovells to care for Mrs. Lehto. There was no undue influence exerted. After the deed was legally executed, Mrs. Lehto simply changed her mind, and that was not a proper basis for relief.

"To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient. *Nelson v Wiggins,* 172 Mich 191; 137 NW 623 (1912). However, in some transactions the law presumes undue influence. The presumption of undue influence is brought to life upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction." *Kar v Hogan,* 399 Mich 529, 537; 251 NW2d 77, 78–79 (1976).

The presumption was brought to life in the instant case. Mrs. Lovell was Mrs. Lehto's favorite niece, and had her trust and confidence. Because

of her faulty memory, Mrs. Lehto was dependent upon Mrs. Lovell to handle her financial affairs. Mrs. Lehto was dependent upon Mr. Lovell for a substantial portion of her income. There was, therefore, a fiduciary relationship between Mrs. Lovell and Mrs. Lehto. Mrs. Lovell benefited from the transaction, by acquiring an immediate interest in the property. Mrs. Lovell had an opportunity to influence Mrs. Lehto's disposition of her property during the trip to Mr. Keleher's office.

Establishment of the presumption created a "mandatory inference" of undue influence, shifting the burden of going forward with the evidence to defendant. *Kar v Hogan, supra* at 541–542; 251 NW2d at 80–81. Mr. and Mrs. Lovell testified that they did not attempt to influence Mrs. Lehto's disposition of her property. This rebuttal evidence turned the presumption into a "permissible inference". The presumption is substantive evidence of undue influence; specifically, the factors giving rise to the presumption are circumstantial evidence that undue influence occurred. *Kar v Hogan, supra, In re Wood Estate,* 374 Mich 278, 290–291; 132 NW2d 35, 43–44; 5 ALR3d 1, 15 (1965). The burden of persuasion remains on plaintiff throughout. *Kar v Hogan, supra.* We therefore weigh the evidence of undue influence pro and con, to determine whether plaintiff has met his burden of persuasion.

There are corroborative facts tending to support the permissible inference of undue influence. Mrs. Lehto did not request her attorney to prepare a deed during the initial conference, but left the disposition of the property in the will intact, except for reference to her deceased husband. This would seem to indicate that she thought of the deed between the time of the initial conference

and the time when she arrived at the office with the Lovells. This in turn suggests that the Lovells requested or pressured her for the disposition. The reason advanced by Mrs. Lehto to her attorney, of avoiding the cost of probate, would seem to be a factor of greater concern to the Lovells than Mrs. Lehto. Mrs. Lehto testified that the Lovells were to care for her, and she was afraid that she would lose income if she did not sign the deed. Finally, it seems illogical for Mrs. Lehto to attempt to dispose of the same property by two different methods, the will and the deed, on the same day.

There are, however, substantial factors tending to counter the inference. First, Mrs. Lovell was the natural object for such a gift. She was Mrs. Lehto's favorite niece, had cared for her in the hospital, and showed concern for her welfare. She was kind enough to handle Mrs. Lehto's financial affairs, an apparently thankless task. Mrs. Lovell's husband was directly responsible for a substantial portion of Mrs. Lehto's income, repaired her barn, and kept her lawn mowed. Mrs. Lehto had obviously intended Mrs. Lovell to eventually get the property, as evidenced by the 1971 and 1973 wills.

Second, although Mrs. Lehto was forgetful, and thus incapable of handling her day to day financial affairs, there is no indication that she lacked the capacity to decide to make a gift, or understand the significance of making such a gift. Mr. Keleher testified that she understood what she was doing, and took pains to explain her actions to her to insure that she understood. Mr. Keleher did not see any sign of incompetency or undue influence.

Third, it appears the decision was left to Mrs. Lehto. Mr. and Mrs. Lovell testified that they did not know why they were taking Mrs. Lehto to Mr. Keleher's office, and did not attempt to influence

her. Mr. Keleher testified that Mrs. Lehto indicated what she wanted, and it was with Mrs. Lehto that he discussed alternatives, which she rejected.

We must discount Mrs. Lehto's testimony of a conspiracy to do her out of her property, and of undue influence. First, her story that the deed was prepared before she arrived, and hence a result of an agreement between Mr. Keleher and the Lovells, appears conjectural and conflicts with that of the other witnesses, including the disinterested secretary of Mr. Keleher. Mrs. Lehto was not "rushed" to the office, but driven there at her request. Although Mr. Keleher's advice may have seemed incomprehensible by the time of the trial, Mr. Keleher was satisfied that she understood it at the relevant time.

Upon reviewing the entire record, we are satisfied that the transaction was intended as a gift. Although Mrs. Lovell or her husband may have suggested a present conveyance to avoid probate costs, rather than wait to receive the property through the will, such suggestion would not have amounted to undue influence. All concerned anticipated that Mrs. Lovell would receive the property upon Mrs. Lehto's death, and Mrs. Lehto discounted the irrevocability of the gift or the need for a contract to bind the Lovells to her. Although the desire to be cared for by the Lovells may have been Mrs. Lehto's motivation, it was uncontroverted that Mrs. Lovell indicated in Mr. Keleher's office that she would not be bound to care for Mrs. Lehto for the rest of her life. Mrs. Lehto eventually became resentful of the Lovell's interference in her financial affairs, and her poor memory, resentfulness, tendency to paranoia, and her predisposition to say things which just are not true resulted in the allegations leading to this action.

We have not been left with a firm and definite conviction that the trial court erred in concluding that there was no undue influence.

The deed was valid even absent consideration. *Cf. Kar v Hogan, supra* at 545; 251 NW2d at 82.

Affirmed. Costs to defendant.

D. E. HOLBROOK, J. *(dissenting)*. This writer respectfully disagrees with the result required by the opinion of the majority in this case. The reasons for this dissent appear in the following opinion.

The instant appeal involves an action by the plaintiff-appellant, Homer Daane, guardian of his ward, Mrs. Bertha E. Lehto, for the rescission of a deed from her to her niece, Angela Lovell, defendant-appellee. The trial court denied relief to the plaintiff, and plaintiff has appealed as of right.

It is necessary to relate the facts as they appear to this writer from the record which shows that Bertha E. Lehto and her husband, Theodore, at the time of the beginning of World War II, lived on the property, the subject of this chancery action.[1] Mr. Lehto had previously received the farm from his parents. Friends of the Lehtos' asked them to go to the Chicago area for the reason that a good job would be there for Mr. Lehto. They left the farm and moved to the vicinity of the new job and lived there for 18 years and then moved back to the farm. Mr. Lehto at that time was unable to work because of disabling arthritis and he qualified for social security benefits. In 1969, Mrs. Lehto

---

[1] "The South Half of the Southeast Quarter of Section 33, Town 24 North, Range 13 West, Cleon Township, Manistee County, Michigan

"The North Half of the Northeast Quarter of Section 4, Town 23 North, Range 13 West, Marilla Township, Manistee County, Michigan

"The East Half of the Northwest Quarter of Section 4, Town 23 North, Range 13 West, Marilla Township, Manistee County, Michigan."

suffered a serious stroke, was hospitalized for a month, was in a coma for a number of days and suffered brain damage as a result of the stroke. Mrs. Lovell, the defendant, was a nurse in the hospital at the time and helped to take care of Mrs. Lehto.

Mr. and Mrs. Lehto, after returning to the farm, executed individual wills in favor of each other and further provided that eventually the subject farm be devised to defendant, Angela Lovell. She was a favorite niece of the Lehtos and she was later advised of what they had provided for her in their wills. After Mrs. Lehto suffered her stroke, not being a driver of an automobile and not being a self-reliant person, she depended upon her husband to take care of the business and her personal affairs. On June 6, 1972, Mr. Lehto passed away and Mrs. Lehto continued to be in need of help in her personal and business affairs. Shortly after Mrs. Lehto's husband died, Angela's husband took Mrs. Lehto to the social security office at Traverse City for two reasons, because (1) the last checks from social security had been made out in both Mr. and Mrs. Lehto's names, and, (2) it was necessary for Mrs. Lehto to have someone manage her financial affairs in relation to her social security benefit checks. Mrs. Lehto asked that Angela be designated as that person and she accepted. Angela Lovell set up a joint bank account with Mrs. Lehto and Mrs. Lehto wrote checks on this account. Mr. Lovell, Angela's husband, helped Mrs. Lehto with managing the farm and qualifying it for soil bank payments from the government. Mrs. Lehto had difficulty living within her limited income of social security benefits and soil payment receipts. It appears that on August 6, 1973, Mrs. Lehto called attorney Dennis Keleher

at Manistee, to have her will changed, *i.e.,* delete her husband's name on the will as a devisee and to change the names of the legatees of her personal property. An appointment was made for the morning of August 10, and the Lovells took Mrs. Lehto to attorney Keleher's office for that appointment.

It is apparent from the testimony of the witnesses that Mrs. Lehto and Angela Lovell, with her husband, had a discussion previous to arriving at the attorney's office, and that Mrs. Lehto had agreed she would deed the property to Angela Lovell, her niece.

Bertha E. Lehto, when she reached the attorney's office, was with both Mr. and Mrs. Lovell. The revised will was executed and also a deed was executed from Mrs. Lehto to Angela Lovell of the 240 acres of land, the subject of this action. Certain parts of the deed as originally drafted were marked out and a clause inserted reserving a life estate in the property to Mrs. Lehto. Attorney Keleher testified that he took 45 minutes to explain to Mrs. Lehto the matter of the various transactions by which she could dispose of her property. Bertha Lehto, however, testified that she did not understand what attorney Keleher was talking about during the conference. It is noted that attorney Keleher had represented the Lovells and the Lehtos separately on previous occasions and, of course, he had drawn up the original wills for Mr. and Mrs. Lehto. The evidence shows that the discussion at the conference between Mr. Keleher and Mrs. Lehto was at all times in the presence of the defendant Angela Lovell and her husband. Attorney Keleher testified that Mrs. Lehto was concerned about the cost of probating an estate and also the cost of preparing a contract as compared to the deed in question. Attorney

Keleher testified that he did not know that Mrs. Lehto had suffered a very serious stroke in 1969, had been hospitalized for 30 days, and in a coma for a number of days and suffered brain damage as a result of the stroke. It is also important to note that Mrs. Lehto was not informed of the gift taxes required to be paid by her as a result of the deeding of her property to Angela Lovell, neither was she advised that she would still have to pay the taxes and insurance on the property and to repair and maintain the property. She was also not advised that she would be restricted in the use of the property, *i.e.,* she would not be able to dispose of trees, gravel and other appurtenances as it would be committing waste. The limited knowledge of Mrs. Lehto of such business transactions and her dependence on the Lovells for help and guidance permitted the full import of the giving of the deed in question to be hidden and not known to Mrs. Lehto.

The stated consideration for the deed was, "One Dollar ($1.00) and other valuable considerations less than Ten Dollars ($10.00)". At the time of the giving of the deed, Mrs. Lehto was 66 years old and a widow for a little over a year.

The defendant, Angela Lovell, was not able to explain what consideration was paid for the property other than love and affection. It is also noted that the will providing for the property to go to Mrs. Lovell was not changed after it was drafted; however, the deed contained certain portions which were stricken out and the reservation of a life estate to Mrs. Lehto inserted. This all took place at the one conference with the attorney. Testimony was admitted regarding Bertha Lehto's mental and physical health following her stroke in 1969. Doctor Long, who treated Mrs. Lehto both

before and after the conveyance, testified in part
as follows:

"*Q. [Mr. Phillips, plaintiff's attorney]* Now, Doctor,
maybe I can refresh your recollection again. At the
time of the deposition, the question was asked regard-
ing whether Mrs. Lehto was having any difficulty in
managing her personal affairs since '69, and I will show
it to you, Page 18, Line 4.

"*A.* 'Question: Now, reviewing the whole file, are you
still of the opinion that Mrs. Lehto would have had
difficulty managing her personal affairs since 1969?'
'Answer: I believe so.' Is that what you wanted?

"*Q.* Yes, Doctor. Do you still believe so?

"*A.* Yes, I believe she would have difficulty managing
her personal affairs."

Angela Lovell received Mrs. Lehto's social secu-
rity checks after Mr. Lehto died in 1972 and the
facts as to this arrangement was testified to by
Mrs. Lovell, as follows:

"*Q. [Mr. Running, plaintiff's attorney]* And that is, as
far as you know, when she said, 'My niece can take care
of this.'?

"*A.* Yes.

"*Q.* Now, did you agree to do it?

"*A.* Yes, I did.

"*Q.* And did you sign certain papers?

"*A.* Yes, I did.

"*Q.* And did you then start to receive her checks?

"*A.* Yes.

"*Q.* Now, when you received the checks, what did you
do with them?

"*A.* I opened an account with Bertha's and my name
together at the Kaleva Bank and deposited the checks
completely in the bank.

"*Q.* When you undertook this arrangement, did you
have an agreement with Bertha of some kind as to
what you were going to do?

"*A.* Yes.

"*Q.* And what was this agreement?

"*A.* To put my name with hers, just in case there was something, that I would be somewhere or something, that I could take a check and pay a bill for her, or this type that I could help pay her bills if she—so that she couldn't, or whatever.

"*Q.* And you opened the checking account in both names, so the checks could be deposited and. . .

"*A.* Yes, sir.

"*Q.* And checks be written by either of you, is that right?

"*A.* Right.

"*Q.* But it is true, isn't it, that you didn't always deposit the checks in the account?

"*A.* I did up to a certain year. Or time. But always, when the checking account was made in her and my name, it was put in every time, sir.

"*Q.* Well, what caused you to stop this arrangement and start cashing them?

"*A.* Because she was overdrawing her account many times, and I requested her not to do this if she could. The last time, I can't remember how many checks she had overdrawn, and I said, 'Aunt Bertha, you. . .'—she had done this many times, and I explained to her, 'Please don't overdraw it. If you need money, let me know and we will try to make some arrangement to pay them.' Or let them, you know—or let me know how much—see, she had the checks. She went out and paid all her own bills, so I didn't know how much really she had written out. Then I would have to go back and correct all these bills. So the last time, I said, 'I think I better help you.'

"*Q.* And do you recall when you started, and you did, didn't you, just start cashing the checks?

"*A.* And paying her bills, yes.

"*Q.* About when would that have been?

"*MR. JENNINGS: [defense attorney]* Your Honor, we filed an accounting which would indicate the exact time on that.

"*WITNESS:* I don't remember.

"*THE COURT:* Gentlemen, maybe you can refer to the accounting and then if there is some question as to whether it is accurate as to its date, then follow it through with testimony.

"*MR. RUNNING:* Your Honor, I have examined it and I don't find what Mr. Jennings suggests on the accounting.

"*WITNESS:* I think it would be 1974, but I am not positive on the dates.

"*MR. JENNINGS:* Your Honor, the accounting which was filed and signed by my client, and which she stated was correct, indicates that the accounting is from December, the receipts from Social Security from December of '74, on until she was relieved, through February of '76.

"*THE COURT:* His question is, when did she go from checks to cash? If she can recall.

"*WITNESS:* That's the time.

"*MR. JENNINGS:* December 1, 1974."

On January 6, 1976, Homer Daane was appointed by the probate court of Manistee County as guardian for Mrs. Lehto, because she was incapable of the care, custody and management of her person and estate.

On February 13, 1976, this action was commenced in chancery for the rescission of the August 10, 1973, deed of Mrs. Lehto to Mrs. Angela Lovell.

Two appraisers gave detailed appraisals as of August 10, 1973, of the value of the subject property which were introduced into evidence. Lawrence M. Mackin of Manistee valued the property at $58,000. Arthur J. Swager of Manistee placed a value of $58,600 on the property.

Neither appraisal included any value related to oil, gas or other subterranean minerals.

Mr. Mackin described the home as being in fair

condition and, "The home does need maintenance and cosmetic improvements".

Plaintiff raises two issues on appeal, claiming that the trial court erred in not rescinding the deed of August 10, 1973, from Bertha E. Lehto to Angela Lovell (1) for the reason that the grantee exercised undue influence upon the grantor and (2) for the reason that there was inadequate consideration.

As to the issue of undue influence, the facts show that Bertha E. Lehto was an elderly lady, who had suffered a serious stroke in 1969, requiring her to be hospitalized for about a month and that she was in a coma for several days. She suffered brain damage as a result of the stroke and was unable to remember happenings well. Her doctor testified that in his opinion after her stroke Mrs. Lehto would have difficulty in managing her personal affairs. It is undisputed that Mrs. Lehto after her stroke was dependent upon her husband in all her business and personal affairs, until his death in June of 1972. Thereafter Mrs. Lehto was dependent upon her niece Mrs. Lovell and her husband for help and guidance in her personal and business affairs. Even the social security personnel knew of this condition for they had Mrs. Lehto select someone to act and help her concerning the social security benefits. Mrs. Lehto selected Mrs. Lovell and she signed papers and accepted this trust. It was during this time that the deed in question was executed. The question arises under these facts: was there a fiduciary relationship between Mrs. Lehto and defendant Mrs. Lovell. In the case of *Van't Hof v Jemison,* 291 Mich 385, 393; 289 NW 186 (1939), our Supreme Court adopted the definition found in Black's Law Dictionary (3d ed), Fiduciary or Confidential Relation, p 775, as follows:

" 'One founded on trust or confidence reposed by one person in the integrity and fidelity of another. * * * The term is a very broad one. * * * The rule embraces both technical fiduciary relations, and those informal relations which exist whenever one man trusts in and relies upon another.' "

In the later case of *LaForest v Black,* 373 Mich 86; 128 NW2d 535 (1964), our Michigan Supreme Court quoted the definition of fiduciary found in *Van't Hof, supra,* with approval and found therein a fiduciary relationship based upon the facts, as set out at 90:

"The trial court found that a fiduciary relationship existed between plaintiff's ward and defendant Geraldine Black. The court based this finding upon the showing that Mrs. Black was a close confidante of Jewell Brink, that she assisted her in banking and the payment of bills, in financial matters and in personal problems. Business problems were discussed with Mrs. Black, money was given to her, legal services were obtained by Mrs. Black for Mrs. Brink, and a variety of other services, business and personal, were entrusted to Mrs. Black."

The facts in the instant case are very similar in the following respects: (1) there was a close relationship between Mrs. Lehto and Mrs. Lovell; (2) the defendant assisted Mrs. Lehto in the payment of her bills; (3) the defendant had a joint checking account with Mrs. Lehto, which allowed Mrs. Lovell access to Mrs. Lehto's funds to assist her in financial matters; (4) the defendant Mrs. Lovell and her husband gave Bertha Lehto advice regarding business matters pertaining to the soil bank; and (5) the defendant Mrs. Lovell and her husband aided in the obtaining of legal services for Mrs. Lehto. In addition, it is clear from the testimony of the witnesses, especially the testimony of Dr.

Long, that Mrs. Lehto was unable to handle her own business matters since her stroke in 1969. It is further clear from all the facts in the instant case that a fiduciary relationship existed between the defendant Mrs. Lovell and Mrs. Bertha E. Lehto. Our Supreme Court in *Kar v Hogan*, 399 Mich 529; 251 NW2d 77 (1976), recently clarified the burden of proof and persuasion pertaining to a claim of undue influence. The Court stated the following at 537:

"The presumption of undue influence is brought to life upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction."

As previously determined, the defendant Angela Lovell clearly had a fiduciary relationship with her aunt, Bertha Lehto. Also, she stands to benefit greatly from the transaction if it is not set aside. Finally, it is clear that the defendant Mrs. Lovell had the opportunity on August 10, 1973, to influence Bertha Lehto to convey the property in question to her. The record establishes the presumption of undue influence in favor of the plaintiff Mrs. Lehto.

The significance of establishing the presumption is set out in the *Kar* case, *supra,* at 542, wherein the Court stated the following:

"If the trier of fact finds the evidence by the defendant as rebuttal to be equally opposed by the presumption, then the defendant has failed to discharge his duty of producing sufficient rebuttal evidence and the 'mandatory inference' remains unscathed. This does not

mean that the ultimate burden of proof has shifted from plaintiff to defendant, but rather that plaintiff may satisfy the burden of persuasion with the use of the presumption, which remains as substantive evidence, and that the plaintiff will always satisfy the burden of persuasion when the defendant fails to offer sufficient rebuttal evidence."

Reviewing the facts of the instant case, this writer believes that it is clear that the defendant Mrs. Lovell has not rebutted the presumption. The defendant Mrs. Lovell, relies upon the fact that Bertha Lehto executed a deed during a conference with attorney Keleher. However, it is clear that this is not significant because attorney Keleher had represented both parties separately in the past. Moreover, the Lovells were present during the entire discussion and thereby inhibited any independent and meaningful consultation between Mrs. Lehto and attorney Keleher. Also, it appears that Bertha Lehto had already agreed to a conveyance prior to her discussion with the attorney. Finally, it appears from the record that Bertha Lehto had little understanding of the significance of the deed which she executed on August 10, 1973, and at the time was under apparent influence of defendant Mrs. Lovell. As stated previously in this opinion, Mrs. Lehto was not informed of the gift tax that she would be required to pay because of the transferring of the property to Mrs. Lovell, nor was she advised that she would have to pay the taxes and insurance on the property and that she would be restricted from that point forward in exercising complete control of the property even though she had retained a life estate. Further, the attorney, Mr. Keleher, did not know that Mrs. Lehto had had a serious stroke in 1969, that her brain had been damaged, that she had

difficulty in managing her personal and business affairs and that she had trouble in remembering events and other things. Also, he did not have the benefit of Dr. Long's testimony.

It appears to this writer that plaintiff sustained her burden of proof as to the first issue and should have prevailed in her prayer for rescission of the deed.

As to the issue of failure of consideration for the execution of the deed, it appears to this writer that there was a failure of consideration in this cause for the reasons hereinafter stated.

The value of the 240 acres of land was established by the only two appraisers as between $58,000 and $58,600—not considering the oil and gas and other minerals in and under the land. Further, there was no mention as to her continued responsibilities to pay the taxes and insurance, maintain the property, nor was she instructed to her limited use of the property that she would be confined. The gift tax was not discussed and there was no money consideration stated on the deed except one dollar and other considerations less than ten dollars. Mrs. Lovell was unable to define any money paid to her aunt, Mrs. Lehto, for the execution of the deed. There was testimony of love and affection between the aunt and the niece, but it appears that it dissipated shortly after the deed was executed. The advantage of the circumstances was all in Mrs. Lovell's favor, which she utilized to her own personal benefit.

It is also interesting to note that the defendant Mrs. Lovell had the deed recorded a few minutes after it was executed. It is marked as being recorded at 11:35 a.m., August 10, 1973.

While it is clear from the record that at the time of the execution of the deed that there was

no formal obligation by Mrs. Lovell to support and
maintain Mrs. Lehto, Mrs. Lehto surely believed
that her niece would continue to show kindness,
service and consideration for Mrs. Lehto's welfare.
It would seem that Mrs. Lehto was traveling under
a wrong hope or belief. When Mrs. Lovell was
asked if she would convey the property to her
aunt, she replied, "no".

There is a principle of law in Michigan that a
deed will be set aside if the consideration is so
grossly inadequate as to shock the conscience of
the court. *Albright v Stockhill,* 208 Mich 468; 175
NW 252 (1919), *Hake v Youngs,* 254 Mich 545; 236
NW 858 (1931), *Olson v Rasmussen,* 304 Mich 639;
8 NW2d 668 (1943), *Low v Low,* 314 Mich 370; 22
NW2d 748 (1946). In the case of *Clement v Smith,*
293 Mich 393; 292 NW 343 (1940), our Supreme
Court in upholding the rescission of a deed of an
elderly widow stated the following regarding inad-
equacy of consideration at 396:

"It is said that equity will set aside a conveyance
executed for a grossly inadequate consideration when
there is great weakness of mind in the person executing
it from age, sickness, or any other cause, which would
not amount to an absolute disqualification. *Allore v
Jewell,* 94 U.S. 506; *Bilman v Kolarik,* 234 Mich. 689
[209 NW 88 (1926)]; *Beattie v Bower,* 290 Mich. 517 [287
NW 900 (1939)]. Though the grantor may have been
capable of understanding the nature of a business
transaction, if there was inability fairly to appreciate
its consequences which resulted in overlooking many
considerations which would lead to sounder judgment,
there is an exposure to imposition by those in confi-
dence. Where the confidence has been abused, as under
the facts before us, equity will not stand by with folded
arms. *Seeley v Price,* 14 Mich 541 [1866]. The conclu-
sion of the trial judge is fortified by the fact that the
conveyance left plaintiff without any security for her
future support, for her life estate in the property would

be practically unmarketable. It has been said that such facts demonstrate beyond question 'either incapacity or dishonest management or both.' *Thorn v Thorn,* 51 Mich 167 [16 NW 324 (1883)]; *Beattie v Bower, supra."*

The facts in the instant case are analogous to those in the foregoing *Clement* case. The *Clement* case is nearly on all fours with our instant case and is applicable to our case.

Mrs. Lehto did not have sound judgment in this transaction and this Court of equity should not stand by with folded arms. This conveyance left plaintiff Mrs. Lehto without security for her future support. Her life estate in the property was practically unmarketable. In the place of its being an asset with great value, it became a liability requiring the payment of taxes, insurance, repair and maintenance costs. Her title was limited to only surface possession. She was unable to sell or dispose of trees, gravel and other appurtenances of value. In the opinion of this writer, the consideration paid for this deed, if any, considering the physical and mental condition of Mrs. Lehto was grossly inadequate and shocks the conscience of this dissenting member of the Court.

This cause of action being in equity, we review it *de novo* on the record. We do not reverse or modify the decision of the trial court unless we feel we would have been compelled to rule for a different result had we been sitting in the position of the trial chancellor in the matter. This writer under the facts in this case, had he been sitting as trial chancellor, would have been compelled to rule that plaintiff had sustained her burden of proof as to both issues and, further, would have granted relief to plaintiff rescinding the deed of August 10, 1973, together with costs. This writer so votes.